IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


LUTHER GLENN,                           )
                                        )        Civil Action No. 06 – 513
                    Petitioner,         )
                                        )        Chief Magistrate Judge Lisa Pupo Lenihan
              v.                        )
                                        )
SUPT. JAMES WYNDER; DISTRICT            )
ATTORNEY FOR THE COUNTY OF              )
ALLEGHENY; and the ATTORNEY             )
GENERAL FOR THE STATE OF                )
PENNSYLVANIA,                           )
                                        )
                    Respondents.


## MEMORANDUM AND ORDER

Petitioner, Luther Glenn (hereinafter referred to as "Glenn" or "Petitioner"), a state prisoner currently incarcerated at the State Correctional Institution in Greensburg, Pennsylvania has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, the Petition will be denied.

### A. Relevant Factual and Procedural History

The facts of the crimes as set forth by the Pennsylvania Superior Court in Petitioner's direct appeal from his judgment of sentence are as follows:

On December 17, 1997, at approximately 6:00 AM Officer Michael Kunsa of the City of Pittsburgh Police Department was on routine patrol in the Homewood section of the city when he was stopped by Georgianna ("Brandy") Cotton, who told him that a man had been shot in the doorway on Sterrett Street. The victim, who was pronounced dead at the scene, was identified as William Anthony Griffin. Detectives, after receiving information from a confidential informant that

appellant had been involved in a shooting, placed appellant's photograph in a photo array, and on December 19, 1997, Ms. Cotton identified the appellant from the photo array as the man whom she saw commit the murder.

On December 22, 1997, Officer Douglas Drwal of the West View Police Department observed a vehicle driven by the appellant traveling at "an extremely high rate of speed." The officer followed, and when appellant's vehicle accelerated and crossed over the double yellow centerline, the officer activated his overhead lights and siren. After a vehicle pursuit of about three miles, during which appellant drove through five or six red lights and stop signs, the vehicle crashed. Appellant fled but was found lying in some weeds after he was chased for two city blocks. Charina Johnson, who was a passenger in appellant's vehicle at the time, gave a statement to police in which she said that appellant had attempted to get her to lie and say that he was at her house at 5:30 a.m. on the day of the murder.

The following month provided two events with a nexus to this Court. While in custody, on January 28, 1998, appellant told fellow inmate Jerry Pratt of his involvement in the murder and of his plans to have someone kill Georgianna Cotton. Appellant mentioned the name Monte Blair as the person who would "take care of" the witness. Two days earlier, on January 26, 1998, police officer Isadore Trunzo observed a vehicle traveling at a high rate of speed and failing to stop for two stop signs. Officer Trunzo, having activated overhead lights and sirens, pursued the vehicle, which ultimately crashed. After the driver fled, the officer discovered a Glock model 21 semi-automatic handgun with thirteen live rounds and a laser sight on it on the driver's seat. The automobile also contained mail addressed to Monte Blair and a photo of Blair, whom Officer Trunzo identified as the person who had fled the vehicle. Blair was apprehended several months later.

(ECF No. 12-2 at 27-29.)

On January 21, 1998, a Coroner's Inquest was held with a sole witness, Cotton, who testified that she had been drinking since at least midnight and all through the early morning hours at the Aurora Club on the day of the homicide. (APP 694-698.)[1] She left the club at 4:30 a.m. and started walking down to Sterrett Street. (APP 698.) On the way, she saw "Ray-Ray" (Petitioner), "Tone" (the victim) and someone else. (APP 698.) Cotton testified that she saw

---

[1] "APP" refers to Petitioner's Appendix to Petition for a Writ of Habeas Corpus, filed February 3, 2010 (ECF Nos. 54-59).

Ray-Ray going into a house in the neighborhood and Tone standing outside.  (APP 698.)  At that point, Cotton went into an abandoned apartment to get high on crack and marijuana.  (APP 703, 705-07.)  Before she was able to assemble her paraphernalia, she heard arguing and so she walked onto the balcony.  (APP 708-09.)  She stated that she saw Ray-Ray and Tone arguing on the corner of Kelly and Starrett directly beneath her.  (APP 709.)  She further testified that she heard Ray-Ray say:  "Nigga, I'm gonna kill you."[2]  (APP 688, 712.)  At that point, Cotton went back into the building to finish her business.  (APP 714.)  About ten to twenty seconds later, however, she heard a screech of tires and looked back outside and saw Ray-Ray jump out of a blue station wagon with a gun in his hand[3] and heard six gunshots being fired.  (APP 714-16, 722.)  She came downstairs from the building and saw Tone laying on the steps grasping for air and a lot of people running away on the street outside.  (APP 719.)  The very last thing that Cotton said in the coroner's inquest was this:  "I don't know what the shooter looked like.  The only thing I know is I know what he had on.  Now I'm not answering no more questions."  (APP 722.)  Based on this testimony, the Court found that the Commonwealth had proved a *prima facie* case against Petitioner and held him over for trial.  (APP 729.)

A week later, on January 28, 1998, Petitioner and fellow inmate Jerry Pratt were transferred from the State Correctional Institution at Pittsburgh (SCI-Pittsburgh) to the Allegheny County Jail where they were briefly held together in the same cell.  (APP 425-26, 1251-52.)  Pratt was transferred to be questioned regarding a credit card investigation while

---

[2]     When questioned about an earlier statement that she did not know who made that statement, she answered that there was only the two of them out there and Tone did not say it.  (APP 713.)  However, she previously testified that there were other people (crackheads) also walking around in that area at that time.  (APP 710.)

[3]     She identified Ray-Ray by the jacket he had on when he was arguing on the street previously.  (APP 716-17.)

Petitioner was transferred for a preliminary hearing at Magistrate City Court based on the charge that he illegally possessed a firearm in connection with the Griffin homicide.  (APP 426-27, 463.)  During the time they shared a cell, Petitioner allegedly confessed to Pratt that he had committed the murder and further told him that a female witness, whose credibility was suspect anyway on the basis that she was a known crackhead, would be taken care of by a person known as Monte Blair.  (APP 427-29, 434.)

At the time he was held with Glenn, Pratt was incarcerated as a parole violator based on his arrest for driving violations on December 8, 1997.[4]  (APP 432-33.)  Because he was on parole at the time of his arrest, he gave authorities his brother's name instead of his own.  (APP 419.)  As a result, he was arrested for falsification to authorities as well as other charges.  (APP 418-19, 421-22.)  On January 29, 1998, Pratt wrote a letter to the Allegheny County District Attorney Stephen Zappala offering his cooperation in the homicide case of Luther Glenn in exchange for a reduction of the charges currently pending against him.  (APP 422, 424, 438-39.)  In his letter to the District Attorney, Pratt related that he wanted his current charge of falsification to authorities reduced to a summary offense whereby he would pay only a fine and thus avoid the violation of his parole.  (APP 424, 439.)

On February 23, 1998, Pratt was interviewed by Assistant District Attorney Ross Lenhardt and county detectives Dennis Logan and Jill Smallwood.[5]  During the interview, Pratt explained that on Wednesday, January 28, 1998, he was in a holding cell at the Allegheny

---

[4]     At the time of his arrest, he was on parole from his state sentence for theft and burglary convictions.  (APP 420.)

[5]     This conversation was taped and a copy of the tape was given to defense counsel prior to trial.  A transcript of the tape is found at APP 1117-1123.

County Jail awaiting to be questioned by city detectives.  (APP 1118.)  Also in the same holding cell was Petitioner who told Pratt that he was there for a firearms violation.  (APP 1118.) Petitioner further told Pratt that he had been at a deputy coroner's inquest for a body.  (APP 1119.)  He stated that a girl was the main witness and that she told detectives that she had seen him shoot a man.  (APP 1119.)  Petitioner further told Pratt that her credibility wouldn't stand up in trial because she was a drunk and a crackhead.  (APP 1119.)  Petitioner then related that the victim had accused him of robbing him and said that "he got out of line and I handled business." (APP 1120-21.)  When Pratt asked him about the witness, Petitioner said that she could be handled too.  (APP 1120-21.)  When Pratt asked him how he was going to do that Petitioner identified Monte Blair and another individual as persons whom could take care of Cotton if the need arose.  (APP 1120.)  Petitioner also stated that Blair almost got "knocked" because he flipped a blue car that had some guns in it.  (APP 1120.)  When Pratt asked Petitioner if he had any conscience about the killing, Petitioner stated that when somebody gets out of line, he smokes them.  (APP 1120.)   After rendering this information to the authorities, the pending unsworn falsification charge against Pratt was dropped.  (APP 431-32.)

On January 26, 1998, two days prior to the conversation between Pratt and Petitioner, police attempted to initiate an automobile stop on Perry Highway where the driver gave chase and ultimately crashed into a telephone pole before fleeing on foot.  (APP 536-39.)  While no one was apprehended at the scene, the police officer discovered a photograph of Monte Blair and mail addressed to him in the vehicle and a .45 Glock semi-automatic handgun with 13 rounds of ammunition and a laser sight on the driver's seat.  (APP 540-41.)  Police identified Blair as the individual who fled from the vehicle.  (APP 541.)  Blair was ultimately prosecuted in connection

with this incident, at which time he testified that he was not the person driving the vehicle, but instead a passenger in the vehicle which was driven by Oronde Shelton.  (App 1185-1244.)  He further testified that the gun the police seized was not his.  (APP 1185-1244.)

Cotton was the Commonwealth's main witness during trial.  She testified that shortly before the murder, she saw Glenn on the corner of Kelly and Sterrett streets some distance from Griffin.  (APP 270.)  Cotton identified Glenn as going by the name "Ray Ray" and testified that he was talking with some friends and wearing a blue jacket with yellow letters on the back at the time.  (APP 275.)  She further testified that shortly before the murder she had gone to the upstairs area of the apartment building that overlooked the area and from there heard Glenn arguing with Griffin on the corner.  (APP 271-72.)  Specifically, Cottton testified that she heard Glenn say, "I'm going to kill you."  (APP 271.)  Cotton testified that Glenn then left and that Griffin came into the vestibule of the building.  (APP 274-75.)  According to Cotton, a couple of seconds later she heard gunshots and observed Glenn pull up in a blue station wagon, exit the vehicle, pull the hood of his blue jacket with yellow lettering up over his head and chase down Griffin, shooting him 6 times in the doorway from 5-6 feet away.  (APP 275-79.)  After the shooting, Cotton testified that she went to check on Griffin, at which time Dwayne Youngblood, the occupant of the downstairs apartment, told her not to say anything.  (APP 279-80.)

Cotton was portrayed by the Commonwealth at trial as a habitual drug user, an individual who had been drinking heavily the night of the incident and was on the balcony overlooking the area where the shooting occurred smoking marijuana and crack cocaine.  When confronted at trial about whether she had previously lied at a coroner's inquest as to whether she had actually seen the shooter's face, Cotton admitted that she identified the shooter from what people told her

on the streets.  (APP 311-12.)  Cotton then changed her story again claiming that she witnessed the shooting but that she had been "threatened" at which point the Judge immediately recessed the proceedings to address the matter with Cotton in chambers.  (APP 313.)  Outside the presence of the jury, the Court attempted to ascertain the reasons behind the contradictions in Cotton's testimony.  (APP 316-30.)  The Court then recessed for the day so as to allow the Commonwealth to consider whether it would continue to prosecute Glenn for the murder of Griffin.  (APP 330-31.)  The Assistant District Attorney sought and received formal immunity for the further receipt of Cotton's testimony when the Court reconvened the next day.  (APP 332.)  After giving testimony totally inconsistent with her statements made in chambers, the Court, upon its own motion, struck Cotton's testimony and instructed the jury to disregard her testimony. (APP 342-57, 361-68.)

The Commonwealth next called Dwayne Youngblood who testified that he lived in the apartment building where Griffin was shot, identified Petitioner as going by the name "Ray-Ray" and testified that "Ray-Ray" had been at his residence earlier that day, about 6-7 hours prior to the murder.  (APP 369-72.)  Charina Johnson testified that she was a passenger in a vehicle driven by Petitioner on December 22, 1997, and that Petitioner fled from the police when the police tried to pull him over in the stolen car he was driving.  (APP 375-77, 391.)  She further testified that she had been involved in a physical relationship with Petitioner and that he kept clothes and other various items at her residence which he frequented while the two were together.  (APP 375.)  Finally, Johnson testified that Petitioner had asked her to testify for him that he was at her house on December 17, 1997, at the time when Griffin was shot, but she

refused because she was not completely sure that he had been at her house at the precise time of the murder.  (APP 377-82.)

The Commonwealth next elicited testimony from Pratt concerning Petitioner's jailhouse admission that he was the shooter.  (APP 425-31.)  Pratt also testified that Petitioner said a female had witnessed the shooting but stated that Petitioner was unafraid of her testimony because she was a crack addict who lacked credibility and further lacked the opportunity to actually witness the shooting.  (APP 427-28.)  Pratt further testified that Petitioner told him that he was not concerned about the eyewitness's testimony because he had a person who could take care of her if such became necessary, identifying Monte Blair and another individual.  (APP 429.)

On June 10, 1999, next to the last day of trial, the Commonwealth used Pratt's reference to Monte Blair to introduce at trial evidence regarding the stop of a rental vehicle alleged to have been driven by Monte Blair on January 26, 1998, two days prior to Petitioner's jailhouse confession.  (APP 536-41.)  According to this testimony, when the police attempted to initiate an automobile stop, the driver attempted to flee, ultimately crashing into a telephone pole before fleeing on foot.  (APP 537-39.)  While no one was apprehended at the scene, the police officer who participated in the nighttime chase claimed at trial that Monte Blair was the sole occupant of the vehicle.  (APP 540-41.)  A search of the vehicle yielded a .45 Glock semi-automatic handgun with 13 rounds of ammunition and a laser sight on the driver's seat.  (APP 540.)  The Commonwealth argued to the jury in closing that Blair was on his way to kill Cotton when his automobile was apprehended.  (APP 594-95.)  On June 11, 1999, the jury returned a verdict of

guilty of first degree murder and Petitioner was sentenced immediately to life incarceration without parole.  (APP 632-33.)

Petitioner filed post-sentence motions on June 14, 1999 wherein he raised the following claims.

1.  That the Court erred in permitting the Assistant District Attorney to prosecute the instant case when the prosecutor became a witness in the case, and the Court refusing to grant a mistrial so that the Assistant District Attorney could be called by the defense as a witness.

2.  That the Court erred in not granting a mistrial when the entire testimony of Brandy Cotton was struck from the record, it being impossible for the defense to remove, from the jury's recollection, the testimony of Ms. Cotton even though it had been struck by the Court.

3.  That the Court erred in admitting evidence concerning Monte Blair when that evidence was not disclosed to the defense until the third day of trial.

(APP 732-36.)  A hearing was held on the motions on October 25, 1999, and the motions were denied on November 3, 1999.  (APP 737.)  Petitioner appealed and filed a Statement of Matters Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).  (APP 739-40.)  The trial court filed its Opinion on July 17, 2000, finding the claims to be without merit.  (APP 741-45.)  Petitioner filed an appellate brief with the Pennsylvania Superior Court (APP 746-71), which affirmed the judgment of sentence on February 12, 2001 (APP 772-86). Thereafter, Petitioner filed a Petition for Allowance of Appeal (APP 787-824), which was denied by the Supreme Court of Pennsylvania on June 12, 2001 (APP 826).[6]

On November 30, 2001, Petitioner filed a *pro se* petition for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa. Const. Stat. § 9541, *et seq*.  (APP 827-904.)  The PCRA

---

[6]      Petitioner was represented both at trial and on appeal by Patrick J. Thomassey, Esq.

9

court appointed J. Richard Narvin, Esquire to represent Petitioner.  Petitioner, through counsel,

filed an amended PCRA petition on September 23, 2003, raising the following claims:

1. Ineffective assistance of trial counsel for advising petitioner to not testify at trial.

2. Ineffective assistance of trial counsel for failing to present the alibi testimony of Michelle Saula, an employee of Bondsman Steve Savor.

3. Actual innocence

4. Prosecutorial misconduct and ineffective assistance of trial counsel for failing to object to the prosecuting attorney's presentation of false testimony and improper comments.

5. Ineffective assistance of appellate counsel for failing to include challenges to the sufficiency and weight of the evidence in petitioner's direct appeal.

6. Ineffective assistance of trial counsel for failing to object to the admission of the photo arrays from which the defendant's photo was included because testimony from the identifying witness was subsequently stricken at trial. Ineffective assistance of appellate counsel for failing to preserve the issue for appeal.

(APP 905-60.)  After the PCRA court filed a Notice of Intent to Dismiss (APP 961), Petitioner

sought permission to file a second amended petition, which the PCRA court granted.  (APP 970-

72.)  A second amended petition was filed on March 2, 2004, which added the following claim:

7. Trial counsel was ineffective in failing to challenge the affidavit in support of his arrest warrant either through evidentiary hearing or motion at trial after the testimony of Georgina Cotton was stricken.

(APP 962-65.)

The PCRA court dismissed the petitions without a hearing on April 8, 2004.  (APP 973.)

Petitioner filed a Statement of Matters Complained of on Appeal pursuant to Pa. R.A.P 1925(b)

(APP 974-77), and the PCRA court filed its Opinion on July 19, 2004, finding the issues raised

to be without merit (APP 978-89).  On June 20, 2005, the Superior Court affirmed the PCRA court's dismissal.  (APP 1027-40.)  The Supreme Court of Pennsylvania denied his Petition for Allowance of Appeal on December 29, 2005.  (APP 1093.)

On April 18, 2006, Petitioner filed his Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  On June 19, 2006, the Court appointed the Federal Public Defender to represent Petitioner in this action.  (ECF No. 15.)  Following several motions for extensions of time, Petitioner's counsel filed a Motion for Discovery, (ECF No. 27), which this Court granted on March 7, 2007.  The Court imposed a discovery deadline of June 1, 2007 and ordered the amended petition to be filed by August 1, 2007.  Discovery was provided to Petitioner on July 6, 2007.  Following this Court's grant of three more motions for extensions of time filed by Petitioner's counsel, the case was stayed by motion of Petitioner's counsel on November 19, 2007.  (ECF No. 39.)

On April 29, 2009, Petitioner moved to reopen the case and his attorneys sought to withdraw based upon a conflict of interest.  (ECF Nos. 41, 42.)  On April 30, 2009, Attorney Adam Cogan was appointed to represent Petitioner.  (ECF No. 44.)  On February 3, 2010, Attorney Cogan filed an Amended Petition raising the following claims:

1. The trial court erred when it refused to grant a mistrial after striking Georgianna Cotton's testimony

2. The trial court erred when it refused to grant a mistrial when the prosecuting attorney became a witness in the case.

3. The trial court erred in permitting the Commonwealth to introduce evidence regarding Monte Blair.

4. Petitioner is entitled to a new trial based on the Commonwealth's failure to disclose the "fraudulent" transport order.

5. Petitioner's right to counsel under <u>Messiah v. United States</u> was violated and trial counsel was ineffective for failing to move to suppress or exclude Jerry Pratt's testimony as the fruit of an illegal interrogation.

6. Trial counsel was ineffective for failing to move to strike additional testimony that Georgianna Cotton identified the defendant from photo arrays and otherwise identified petitioner as the shooter.

7. The trial court and trial counsel failed to adequately advise petitioner about his right to testify at trial and petitioner's decision not to testify at trial was not knowing, intelligent and voluntary.

8. Appellate counsel was ineffective for failing to challenge the weight and the sufficiency of the evidence on appeal.

9. Trial counsel was ineffective for failing to conduct an adequate pretrial investigation into an alibi defense and for failing to present the defense at trial.

(ECF No. 52 at 5.)  Respondents filed an Answer to the Amended Petition on June 10, 2010, (ECF No. 71), and Petitioner filed a Reply to the Answer on September 30, 2010 (ECF No. 74). By order of the Court, Respondents were directed to file a Supplemental Answer to address the applicability of <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012) to four specified claims within the Amended Petition.  (ECF No. 97.)  The Supplemental Answer was filed on August 1, 2012 (ECF No. 98), and a Reply to the Supplemental Answer was filed by Petitioner on August 9, 2012 (ECF No. 99).  Petitioner's Amended Petition is now ripe for review.

## B.  Standards Governing Federal Habeas Corpus Review

1. <u>Exhaustion Requirement</u>

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief.  To comply with the exhaustion requirement, a state prisoner first must have fairly presented his

constitutional and federal law issues to the state courts through direct appeal, collateral review, state habeas proceedings, mandamus proceedings, or other available procedures for judicial review. *See*, *e.g.*, Castille v. Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996); Burkett v. Love, 89 F.3d 135, 137 (3d Cir. 1996). Moreover, a petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before exhaustion will be considered satisfied. O'Sullivan v. Boerckel, 526 U.S. 838 (1999). Petitioner has the burden of establishing that exhaustion has been satisfied. Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987).

Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state prisoner's claims prior to exhaustion when no appropriate state remedy exists. Christy v. Horn, 115 F.3d 201, 206 (3d Cir. 1997); Doctor, 96 F.3d at 681; Carter v. Vaughn, 62 F.3d 591, 594 (3d Cir. 1995). A petitioner shall not be deemed to have exhausted state remedies, however, if he has the right to raise his claims by any available state procedure. 28 U.S.C. § 2254(c). An application for a writ of habeas corpus may be denied on the merits, however, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State. 28 U.S.C. § 2254(b)(2).

2. Procedural Default Doctrine

Beyond questions of exhaustion, a federal court may be precluded from reviewing claims under the "procedural default doctrine." Gray v. Netherland, 518 U.S. 152 (1996); Coleman v. Thompson, 501 U.S. 722, 732 (1991); Doctor, 96 F.3d at 678; Sistrunk v. Vaughn, 96 F.3d 666, 678 (3d Cir. 1996). Like the exhaustion requirement, the procedural default doctrine was

developed to promote our dual judicial system and, in turn, it is based upon the "independent and adequate state law grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment.  Coleman, 501 U.S. at 750.

A state's procedural rules are entitled to deference by federal courts; a petitioner's violation of a state procedural rule may constitute an independent and adequate state law ground for denial of federal review of habeas claims under the procedural default doctrine.  Id.; Sistrunk, 96 F.3d at 673.  Moreover, violations of a state's procedural rules may constitute an independent and adequate state ground sufficient to invoke the procedural default doctrine even where no state court explicitly has concluded that a petitioner is procedurally barred from raising his claims.  Glass v. Vaughn, 65 F.3d 13, 15 (3d Cir. 1995), *cert. denied*, 516 U.S. 1151 (1996); Carter, 62 F.3d at 595.  However, the procedural default doctrine only applies when a state procedural rule is consistently or regularly applied.  Banks v. Horn, 126 F.3d 206, 211 (3d Cir. 1997) (quoting Johnson v. Mississippi, 486 U.S. 578, 588-89 (1988)).[7]  A petitioner whose constitutional claims have not been addressed on the merits due to procedural default can overcome the default, thereby allowing federal court review, if he or she can demonstrate either: 1) "cause" for the default *and* "actual prejudice" as a result of the alleged violation of federal law; or 2) failure to consider the claims will result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750; Carter, 62 F.3d at 595.

---

[7]     *See also* Doctor, 96 F.3d at 675 (the state rule must be firmly established and regularly followed before it can be considered an independent and adequate state law ground sufficient to foreclose federal court review under the procedural default doctrine).

To satisfy the cause standard, a petitioner must demonstrate that some objective factor external to the defense impeded his or her efforts to raise the claim in state court. <u>McCleskey v. Zant</u>, 499 U.S. 467, 493 (1991); <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). To show prejudice, a petitioner must demonstrate that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions, not merely that the error created a "possibility of prejudice." <u>Carrier</u>, 477 U.S. at 494. Where a petitioner cannot make a showing of "cause and prejudice," a federal court may nevertheless consider the merits of his or her unexhausted claims under circumstances in which the failure to adjudicate such claims would result in a "fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. This exception to the procedural default doctrine is based on the principle that, in certain circumstances, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" <u>Carrier</u>, 477 U.S. at 495 (quoting <u>Engle v. Isaac</u>, 456 U.S. 107, 135 (1982)).

The "prototypical example" of a miscarriage of justice is a situation in which an underlying constitutional violation has led to the conviction of an innocent defendant. <u>Sawyer v. Whitley</u>, 505 U.S. 333, 340 (1992). In that instance, the merits of a petitioner's claims can be considered notwithstanding his or her failure to raise them before the state courts. In order to avail himself or herself of this exception to the procedural default rule, a petitioner must make a substantial showing that he or she is actually innocent of the crime for which he or she is incarcerated. <u>Schlup v. Delo</u>, 513 U.S. 298, 324 (1995). "To be credible, such a claim requires [the] petitioner to support his [or her] allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or

critical physical evidence – that was not presented at trial." Id. If this requirement is satisfied, the federal court must consider "whether it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence." Hubbard v. Pinchak, 378 F.3d 333, 340 (3d Cir. 2004). This standard "does not merely require a showing that a reasonable doubt [as to the petitioner's guilt] exists in the light of the new evidence, but rather that no reasonable juror would have found the [petitioner] guilty." Schlup, 513 U.S. at 329. "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." House v. Bell, 547 U.S. 518, 538 (2006).

While the petitioner's innocence need not be determined with "absolute certainty" at this "gateway stage," his or her burden is to demonstrate that, in light of the new evidence, it is more likely than not that *any* reasonable juror would have reasonable doubt as to his or her guilt. Id. In the habeas corpus context, a federal court sits to ensure that an individual is not imprisoned in violation of the Constitution and laws of the United States, "not to correct errors of fact." Herrera v. Collins, 506 U.S. 390, 400 (1993). Consequently, a finding of "actual innocence" is not an independent ground for habeas corpus relief, but rather a "gateway" through which a petitioner can pass to have a federal court consider underlying claims that would otherwise be subject to procedural default. Id. at 404. In the absence of new evidence of the petitioner's innocence, the existence of an underlying constitutional violation provides a federal court with no basis for adjudicating a procedurally defaulted claim. Goldblum v. Klem, 510 F.3d 204, 225-226 (3d Cir. 2007). Only after the presentation of new evidence may a federal court proceed to consider whether, in light of *all* relevant evidence, it is more likely than not that no reasonable

juror would vote to convict the petitioner of the crime for which he or she is incarcerated. House, 547 U.S. at 537-39; Goldblum, 510 F.3d at 225-26.

Finally, the United States Court of Appeals for the Third Circuit has instructed that a petition containing exhausted and unexhausted but procedurally barred claims is not a mixed petition requiring dismissal under Rose v. Lundy, 455 U.S. 509 (1982). *See* Wenger v. Frank, 266 F.3d 218, 227 (3d Cir. 2001). Instead, the Court of Appeals held that the district court should review the merits of the exhausted claims but must not decide the merits of the claims that are barred under the procedural default doctrine. Id.

3. Standard of Review for Exhaustion (but not Procedurally Defaulted) Claims

In describing the role of federal habeas proceedings, the Supreme Court of the United States, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence . . . . The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 100 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d).

"A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Few state court decisions will be "contrary to" Supreme Court precedent.  "Clearly established Federal law" should be determined as of the date of the relevant state-court decision.  Greene v. Fisher, 606 F.3d 85, 95 (3d Cir. 2010), aff'd, Greene v. Fisher, 132 S. Ct. 38 (2011).

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent.  "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably

refuses to extend that principle to a new context where it should apply.'" Id. (quoting Williams, 529 U.S. at 407).

A recent decision of the Supreme Court illustrates the deference that the federal courts must accord to state court decisions.  In Renico v. Lett, 130 S. Ct. 1855 (2010), the Supreme Court reviewed the Court of Appeals for the Sixth Circuit's grant of a writ of habeas corpus to a defendant who was retried for murder following the trial judge's grant of a mistrial after the jury had deliberated for at least four hours following a relatively short, and far from complex, trial. The Michigan Supreme Court had concluded there was no violation of the Double Jeopardy Clause because the trial court exercised its sound discretion.  The federal district court granted a writ of habeas corpus and the Sixth Circuit affirmed, both concluding that the trial court's declaration of a mistrial constituted an abuse of discretion because there was no manifest necessity.  The Supreme Court reversed.

> It is important at the outset to define the question before us.  That question is not whether the trial judge should have declared a mistrial.  It is not whether it was an abuse of discretion for her to have done so -- the applicable standard on direct review.  The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law."  § 2254(d)(1).

Lett, 130 S. Ct. at 1862.  The Supreme Court further instructed:

> It is not necessary for us to decide whether the Michigan Supreme Court's decision -- or, for that matter, the trial judge's declaration of a mistrial -- was right or wrong.  The latter question, in particular, is a close one.  As Lett points out, at a hearing before the Michigan Court of Appeals, the state prosecutor expressed the view that the judge had in fact erred in dismissing the jury and declaring a mistrial.  The Michigan Supreme Court declined to accept this confession of error, People v. Lett, 463 Mich. 939, 620 N.W.2d 855 (2000), and in any event -- for the reasons we have explained -- **whether the trial judge was right or wrong is not the pertinent question under AEDPA.**

Id. at 1865, n.3 (emphasis added).

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. Id. (citing Marshall v. Longberger, 459 U.S. 422, 433 (1982)). Where the state court fails to adjudicate or address the merits of a petitioner's claims, unless procedurally defaulted, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact. Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001). Petitioner's claims will be reviewed in accordance with the standards set forth above.

## C. Petitioner's Claims

### 1. The trial court erred when it refused to grant a mistrial after striking Georgianna Cotton's testimony.

In this claim, Petitioner complains that the trial court's denial of defense counsel's motion for mistrial after striking Georgianna Cotton's testimony violated his due process rights. Contrary to Respondent's assertion, this claim has been exhausted as Petitioner raised it in his direct appeal on the basis that the court's denial to grant a mistrial denied him a fair trial.

A claim that one was denied "due process" is a claim that one was denied "fundamental fairness." *See* Riggins v. Nevada, 504 U.S. 127, 149 (1992) ("We have said that 'the Due

Process Clause guarantees the fundamental elements of fairness in a criminal trial'"); <u>Lisenba v.</u>

<u>California</u>, 314 U.S. 219, 236 (1941) ("The aim of the requirement of due process is . . . to

prevent fundamental unfairness").  When reviewing claims alleging the denial of due process,

the Supreme Court has cautioned that:

> [i]n the field of criminal law, we have defined the category of infractions that
> violate 'fundamental fairness' very narrowly based on the recognition that,
> beyond the specific guarantees enumerated in the Bill of Rights, the Due Process
> Clause has limited operation.  The Bill of Rights speaks in explicit terms of many
> aspects of criminal procedure, and the expansion of those constitutional
> guarantees under the open-ended rubric of the Due Process Clause invites under
> interference with both considered legislative judgments and the careful balance
> that the Constitution strikes between liberty and order . . . [I]t has never been
> thought that decisions under the Due Process Clause establish this Court as a rule-
> making organ for the promulgation of state rules of criminal procedure.

<u>Medina v. California</u>, 505 U.S. 437, 443 (1992) (internal quotations and citations omitted).

> Judges are not free, in defining 'due process,' to impose on law enforcement
> officials their personal and private notions of fairness and to disregard the limits
> that bind judges in their judicial function.  They are to determine only whether the
> action complained of violates those fundamental conceptions of justice which lie
> at the base of our civil and political institutions, and which define the
> community's sense of fair play and decency.

<u>Dowling v. United States</u>, 493 U.S. 342, 353 (1990) (internal quotation and citations omitted).

Moreover, a federal court must keep in mind the standard of review to be applied to

allegations of trial error.  In this regard, criminal defendants in this country are entitled to a fair,

but not a perfect, trial.  "[G]iven the myriad safeguards provided to assure a fair trial, and taking

into account the reality of the human fallibility of the participants, there can be no such thing as

an error-free, perfect trial," and the Constitution does not demand one.  <u>United States v. Hasting</u>,

461 U.S. 499, 508 (1983) (internal citations omitted).  The focus on fairness, rather than on

perfections, protects society from individuals who have been duly and fairly convicted of crimes,

thereby promoting "public respect for the criminal process."  Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).

The basis for Petitioner's first claim rests on the following set of events.  At trial, the Commonwealth called Cotton, who testified that she had seen Petitioner shoot the victim six times in the early morning hours of December 17, 1997.  (APP 278-79.)  On cross-examination, Cotton said that she did not actually see Petitioner's face but had identified him based on what other people had told her.  (APP 312.)  Because of the conflicting nature of this testimony, Judge Zottola held an *in camera* hearing, in which Cotton stated that she was fearful as a result of death threats from Petitioner's family but that Petitioner did, in fact, shoot the victim.  (APP 320-21.) However, upon further questioning, she said that she did not see the incident but was told that Petitioner had done the killing.  (APP 324.)  After she was granted immunity from perjury charges, Cotton was allowed to retake the stand, at which point she testified that she had heard six gunshots, that she had heard Petitioner's voice prior to the shooting and that she had seen Petitioner after the shooting jumping into a car.  She also stated that the reason that she had not said some of these things before was because she was afraid for another person's life.

At this point, defense counsel requested a mistrial based on Cotton's conflicting testimony.  (APP 351-54.)  The trial court denied this request and instead, on its own motion, struck Cotton's testimony in its entirety.  (APP 367-68.)  Immediately upon his decision to strike Cotton's testimony, Judge Zottola instructed the jury to totally disregard her testimony.

In denying this claim, the Superior Court of Pennsylvania held as follows:

> Appellant next contends that the trial court erred when it refused to grant a mistrial after the testimony of Georgianna ("Brandy") Cotton was stuck in its entirety from the record.  Ms. Cotton provided conflicting accounts of the events

in question and testified that she did not see who shot the victim, but was only told that the defendant had shot him.  Furthermore, she indicated she was under the influence of both drugs and alcohol at the time of the shooting.  According to the trial court's opinion, the following occurred at trial: "Measures were taken to scrutinize the extremely inconsistent statements given by the witness.  She testified *in camera*, was granted immunity [by the prosecutor], and was given counsel."  She then returned to the stand for redirect testimony but again provided a contradictory story.  Based on these contradictory statements a mistrial was requested by defense counsel.  The trial court refused the request for mistrial, but struck the testimony of Ms. Cotton based on her intoxication at the time of the incident and her inconsistent trial testimony.

We find no merit in the contention of appellant that "no curative instruction could inure to the benefit of [appellant]."  It is well settled that a jury is presumed to follow the instructions of a trial court to disregard inadmissible evidence.

In this case the jury was instructed as follows:

THE COURT:  Good afternoon, ladies and gentlemen.  The Court has made the following ruling on its own motion:  You are to completely [and] totally disregard the testimony of Ms. Cotton.  Her testimony is not to play any part in your determination as to the facts in this case.  It is as if she has not testified.  Do you understand that, ladies and gentlemen?

THE JURY:  Yes.

The trial judge reiterated this instruction in his closing charge:

THE COURT:  [Y]ou must not consider any testimony . . . which I have ordered stricken from the record.  So that it is clear, ladies and gentleman, I ordered st[r]icken from the record the testimony of Ms. Cotton.  You must not, I repeat, must not, consider that testimony for any reason whatsoever.  It should be as if that witness never took the witness stand.

These firm and certain and clear instructions to the jury not to consider the testimony of Ms. Cotton, in the light of our case law which presumes that the jury will follow the trial court's instructions, compel us to reject the contention of appellant that the trial court abused its discretion in denying his motion for a mistrial based on the contradictory statements of Ms. Cotton.

23

(APP 779-81) (internal citations omitted).

As stated above, this Court is required to review Petitioner's claims in accordance with the standard of review set forth in AEDPA. Specifically, in order to be entitled to relief, Petitioner must show that the Pennsylvania Court's decision upholding the denial of a mistrial in this instance was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.[8] This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) (internal citations omitted). The petitioner carries the burden of proof.

A state court decision fails the "contrary to" prong of AEDPA if the state court reaches a conclusion opposite to the Supreme Court's own conclusion on a question of law or decides the case differently where the Supreme Court was confronted by a set of materially indistinguishable facts. McMullen v. Tennis, 562 F.3d 231, 236 (3d Cir. 1990) (quotation and citations omitted). This Court has not discovered any Supreme Court case that has squarely considered this issue. Consequently, Petitioner cannot show that he is entitled to relief under the contrary to prong of AEDPA.

A state court ruling is considered an "unreasonable application" if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal

---

[8]     Some circuit court of appeals have restricted their review under AEDPA to United States Supreme Court decisions alone. See, e.g., Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (considering itself barred from examining "lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law"). The Court of Appeals for the Third Circuit, however, has concluded that decisions of federal courts below the level of the United States Supreme Court may be helpful to us in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as "helpful amplifications" of that precedent. Moore v. Morton, 255 F.3d 95, 105 (3d Cir. 2001) (quoting Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir.) (en banc), cert. denied, 528 U.S. 824 (1999)).

principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply.  Harris v. Ricci, 607 F.3d 92, 96 (3d Cir. 2010).

The Supreme Court long has recognized that the conduct of the trial is regulated under the sound discretion of the trial judge, Herring v. New York, 422 U.S. 853, 862 (1975), and the trial court is in the best situation to intelligently determine if a mistrial is necessary.  Gori v. United States, 367 U.S. 364, 368 (1961).  Moreover, long standing Supreme Court precedent recognizes a judge's ability to mitigate potential prejudice through curative instructions.  For example, in Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974), the Court denied the petitioner's claim for habeas relief noting that, although the prosecutor's statement was improper, it was not so prejudicial that its effect could not be mitigated by a curative instruction. Finding the trial court had issued a "strong" instruction, twice stating the prosecutor's arguments were not evidence and directing the jury to disregard the offensive statement in particular, the Court held any prejudice had been cured.  Id. at 643-44.  See also Darden v. Wainwright, 477 U.S. 168, 182 (1986), reh'g denied, 478 U.S. 1036 (1986).  Although there are some occurrences at trial that may be too clearly prejudicial for a curative instruction to mitigate their effect, see Bruton v .United States, 391 U.S. 123, 135 (1968) (admission of co-defendant's inculpatory confession too prejudicial to be cured through jury instruction), Petitioner has not made such a demonstration in the instant case.

Petitioner initially relies on United States v. Lee, 573 F.3d 155 (3d Cir. 2009).  In Lee, a case decided on direct appeal, the government provided to the defendant a photocopy of the front of a hotel registration card, which indicated that the defendant had rented a hotel room for one night.  At trial, the jury examined the actual card and discovered writing on the back of the card

indicating that the defendant had extended his stay.  The Third Circuit found that the government had committed a Rule 16 discovery violation and that its denial of defendant's motion for mistrial was an abuse of discretion because it denied the defendant the opportunity to adjust his defense theory.  Because the defendant was denied the opportunity to meaningfully prepare, the Court determined that a mistrial, rather than a curative instruction, was proper.  *Cf*. United States v. Iyamu, 393 F. App'x 667 (11th Cir. 2010) (district court did not err in denying motion for a new trial because the government did not commit a Rule 16 discovery violation).  Review of the instant action is not on direct appeal and it is not within this Court's purview to determine whether the trial court abused its discretion.   Rather, this Court must decide whether the Pennsylvania Court's decision upholding the denial of a mistrial was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.   The Court's ruling in Lee simply is of little value in making this determination.

Petitioner also cites to Vazquez v. Wilson, 550 F.3d 270 (3d Cir. 2008).  In that case, Vasquez and Santiago were on trial for murder and other offenses.  The evidence showed that three men were driving a car when one of them fired a weapon at another vehicle, killing the victim.  A weapon was recovered which contained one fingerprint that was matched to Vazquez and other prints that were too smudged for comparison.  Santiago gave a statement in which he reported that he was the driver and that Vazquez and another individual, George Rivera, were the passengers, and that Vazquez was the shooter.   Santiago did not testify at trial, and the prosecution introduced his statement, substituting "my boy" or "the other guy" for the names of Vazquez and Rivera.   Santiago's attorney was permitted to tell the jury that Santiago had

identified the other individuals by name and had offered to show the police their homes. Vazquez took the stand and testified that Rivera (who was not on trial) was the shooter, and that Rivera passed him the weapon telling him to get rid of it. In closing argument the prosecutor effectively eliminated the redaction by reinstating the defendant's name in the statement, thereby identifying Vazquez as the shooter. Following closing arguments, the court instructed the jury that it should not consider the co-defendant's statement as evidence against the defendant. The jury acquitted Santiago and convicted Vasquez.

On federal habeas review, the Third Circuit concluded that the state courts had unreasonably applied the Confrontation Clause, in violation of Bruton v. United States, 391 U.S. 123 (1968). In Bruton, the Supreme Court held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a non-testifying co-defendant is introduced at their joint trial despite clear and strong cautionary instructions that the confession could only be used against the co-defendant. In his concurrence, Justice Stewart explained "I think it is clear that the underlying rationale of the Sixth Amendment's Confrontation Clause precludes reliance upon cautionary instructions when the highly damaging out-of-court statement of a co-defendant, who is not subject to cross-examination, is deliberately placed before the jury at a joint trial." 391 U.S. at 137-38 (Stewart, J., concurring). Moreover, in Vazquez, the court further noted that it was clear that the "curative" instruction was ineffective because the jury came back with questions regarding whether they were to consider the co-defendant's statement as evidence. Thus, Vazquez, which was decided on the basis of a Sixth Amendment violation, has no application in Petitioner's burden to show that the Pennsylvania Court's determination that the trial court did not err in failing to declare a mistrial after striking

inconsistent testimony was an objectively unreasonable application of Supreme Court precedent concerning the Due Process Clause.

Petitioner also relies on <u>Moore v. Morton</u>, 255 F.3d 95 (3d Cir. 2001), where the victim, a Caucasian female, was brutally raped and assaulted in her dark house when she was not wearing her contact lenses.  She required hypnotically enhanced memory to provide a composite sketch of her alleged attacker, Clarence Moore, an African-American man.  In his closing argument, the prosecutor made three statements which the Court of Appeals for the Third Circuit deemed prejudicial, notwithstanding the trial court's curative instructions to the jury.  The prosecutor first inferred that Moore, whose wife was Caucasian, had a proclivity for Caucasian women and, therefore, selected the victim because of her race.  Next the prosecutor improperly argued that Moore raped the victim because of his need for sexual release because his wife had recently given birth and was suffering from complications.  Finally, the prosecutor offered the remark that the jury would perpetrate a worse assault on the victim if they thought she was lying.  The Third Circuit reversed the district court's denial of Moore's petition for a writ of habeas corpus, finding the prosecutor's improper race-based arguments to be highly prejudicial and in derogation of his right to a fair trial.  Specifically, the Court noted that the prosecutor's "selection" argument appealed to "biases against miscegenation and ugly stereotypes . . . [and such] [r]acially or ethnically based prosecutorial arguments have no place in our system of justice."  <u>Id</u>. at 113.  The prosecutor's "sexual release" argument, also improper, was deemed adequately remedied by the trial court's curative instruction.  <u>Id</u>. at 116.  Furthermore, the Court held that the prosecutor's equally prejudicial comment that the jury would commit "a worse assault on [the victim]," amounted to "an improper appeal to the jurors' passions."  <u>Id</u>. at 117.  The Court noted that while

this remark, standing alone, could be cured "with strong instructions like those the trial judge issued here . . . when viewed in light of the prosecutor's 'selection' argument, we believe that due process concerns are implicated" and concluded that "[t]ogether, the prosecutor's 'selection' argument and the 'perpetrating worse assault' argument were not only improper but prejudicial." Id. at 118.

First, Moore is easily distinguishable from the instant action as that case involved a prosecutor who deliberately made racist comments in an attempt to appeal to the jury's prejudices. Second, Moore was decided in June of 2001, four months after the Superior Court upheld the trial court's denial of a mistrial in the case at bar. As recently noted by the United States Supreme Court: "Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made." Cullen, 131 S. Ct. at 1398. Because the Superior Court's determination predates Moore, it has no relevance to the Court's review. Finally, the Court of Appeals for the Third Circuit specifically has recognized that Moore is not "clearly established federal law determined by the Supreme Court," required for relief under AEDPA. See Minett v. Hendricks, 135 F. App'x 547, 553 (3d Cir. 2005).

The Court of Appeals for the Third Circuit recently outlined the proper review of state court decisions under AEDPA in Harris v. Ricci, 607 F.3d 92 (3d Cir. 2010). In describing a federal court's role in habeas review, the Court of Appeals for the Third Circuit explained as follows:

. . ., we cannot decide this case on the basis of any of those authorities because, as we noted at the outset, this case is governed by AEDPA.  Harris must show that the New Jersey Supreme Court's decision upholding the use of foreign jurors to ameliorate the effects of the pretrial publicity was contrary to law clearly established by the Supreme Court of the United States.  *See* 28 U.S.C. § 2254(d)(1).  Even Harris concedes that the Supreme Court has never squarely considered this issue.

A recent decision of the Supreme Court illustrates its deferential approach to the state courts' decisions, even in the face of what appears to be its doubt about the merits of that decision.  In Renico v. Lett, ___ U.S. ___, 130 S. Ct. 1855, 1861-62 (2010), the Court reviewed the Sixth Circuit's grant of a writ of habeas corpus to a defendant who was retried for murder following the trial judge's grant of a mistrial after the jury "had deliberated for at least four hours following a relatively short, and far from complex, trial . . . ."  The Michigan Supreme Court had concluded there was no violation of the Double Jeopardy Clause because the trial court exercised its sound discretion.  The federal district court granted a writ of habeas corpus, and the Sixth Circuit affirmed, both concluding that the trial court's declaration of a mistrial constituted an abuse of discretion because there was no manifest necessity.

The Supreme Court reversed and its reasoning is instructive here.  It stated that the question "is not whether the trial judge should have declared a mistrial.  It is not even whether it was an abuse of discretion for her to have done so-the applicable standard on direct review.  The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was 'an unreasonable application of . . . clearly established Federal law,'" and it later explained that the application must be "objectively unreasonable."  In reversing the Court of Appeals, the Court stated in a footnote, "whether the trial judge was right or wrong is not the pertinent question under AEDPA."  It noted that the Michigan Supreme Court's decision, "while not necessarily correct – was not objectively unreasonable."

Harris, 607 F.3d at 98-100 (internal footnotes, citations and quotations omitted).

Thus, the question for review is whether the determination of the Pennsylvania Superior Court that there was no abuse of discretion in denying Petitioner's motion for a mistrial was an unreasonable application of clearly established Federal law.  Petitioner cites no Supreme Court case clearly establishing the denial of a mistrial based on stricken testimony where limiting

instructions were given constitutes a violation of federal fair trial rights.   Review of clearly established federal law suggests that it was not.   To the contrary, the most relevant Supreme Court cases suggest differently.   For example, in <u>Greer v. Miller</u>, 483 U.S. 756 (1987), the prosecutor improperly questioned the defendant about his post-arrest silence.   Defense counsel objected to the question before the defendant could answer.   The judge sustained the objection and instructed the jury to ignore the question, but gave no explanation for the ruling.   The trial continued without further reference to the defendant's silence after receiving the Miranda warnings.   The Supreme Court held that there was no due process violation in these circumstances because "[t]he fact of [the defendant's] postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference."   <u>Id</u>. at 764-65.   Moreover, the Supreme Court noted that courts should "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it."   <u>Id</u>. at 766, n.8.   Relying in part on <u>Greer</u>, the Court of Appeals for the Third Circuit held that denial of a mistrial sought on the ground that improperly admitted other crimes evidence violated federal fair trial rights, did not violate clearly established Supreme Court precedent where curative instructions were given.   *See* <u>Minett v. Hendricks</u>, 135 F. App'x 547 (3d Cir. 2005).   *See also* <u>United States v. Edinborough</u>, 379 F. App'x 271 (3d Cir. 2010) (holding that the district court did not abuse its discretion in denying motion for mistrial based on contradictory testimony of government informant).

Based on the discussion above, the Court finds that Petitioner has not met his burden of showing that he is entitled to habeas corpus relief as to his first claim.

**2. The trial court erred when it refused to grant a mistrial when the prosecuting attorney became a witness in the case.**

In his second claim, Petitioner asserts that the trial court erred by refusing to grant a mistrial when the prosecuting attorney became a witness in the case. This claim is premised on four subclaims, that the prosecutor improperly bolstered the case by (1) referring to himself 49 times during closing argument in explaining his personal belief that Petitioner was the shooter, (2) chastising the defense for putting him personally on trial, (3) chastising defense counsel Thomassey for refusing to refer to him by name, and (4) vouching for the credibility of Jerry Pratt by (a) arguing that he personally interviewed Georgianna Cotton and that Jerry Pratt was truthful because he told the police that Cotton's testimony would withstand scrutiny at trial; and (b) paying money for Jerry Pratt to be released from jail and indicating in writing that he wanted to be paid back. In his habeas petition, Petitioner expanded this claim from the one he raised on direct appeal. On direct appeal, Petitioner claimed that the trial court erred by permitting the assistant district attorney to continue to prosecute the case when he became a potential witness and that it also erred by refusing to grant a mistrial so that the defense could call him as a witness. However, Petitioner argued only that this occurred when (1) the prosecutor, in open court, indicated that he was responsible for Cotton's release from jail thereby vouching for Cotton's credibility; and (2) the prosecutor improperly involved himself in the reduction or dismissal of charges undertaken by the Commonwealth for Jerry Pratt. Therefore, Petitioner has included subclaims within the instant habeas claim that were not raised on direct appeal. As noted by Respondents, these subclaims are now procedurally defaulted.

In his Reply brief, Petitioner claims that the failure to preserve and exhaust his claims was the result of ineffective assistance of counsel.  However, this argument fails to excuse the procedural default of the subclaims at issue here for the following reasons.  First, under Pennsylvania law, such ineffective assistance claims must have been exhausted at the earliest opportunity, which would have been during Petitioner's PCRA proceeding.  Petitioner did not, however, raise such a claim of ineffective assistance of trial counsel in his PCRA proceeding and Petitioner's failure to have raised his claims there results in a procedural default.  *See* Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  To the extent Petitioner contends that his claim of trial counsel ineffectiveness was not properly presented to the state court due to the error of PCRA counsel, the Court is cognizant that the Supreme Court recently held that a habeas petitioner may establish cause for his default of an ineffective assistance of trial counsel claim by demonstrating that PCRA counsel rendered ineffective assistance at initial-review collateral proceedings. Martinez v. Ryan, 132 S. Ct. 1309 (2012).  The Court summarized the two situations in which a prisoner may establish cause for a default of an ineffective assistance claim:

> The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial.  The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984).

Id. at 1318.  In addition to proving that one of those two situations applies, the prisoner "must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."  Id.  With respect to what constitutes a "substantial" claim, the Court suggested, by citing Miller-El v.

Cockrell, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue), that courts should apply the standard for issuance of certificates of appealability.

Until Martinez was decided, cause could not be shown in this manner because there is no constitutional right to counsel in PCRA proceedings, Pennsylvania v. Finley, 481 U.S. 551, 555 (1987), nor a constitutional right to the effective assistance of counsel in PCRA proceedings. Coleman, 501 U.S. at 752-53. Although the Supreme Court declined to hold that there is a constitutional right to counsel in initial collateral review proceedings, Martinez opened an avenue for cause that Coleman previously foreclosed. However, Martinez does not provide Petitioner relief with respect to excusing the procedural default at issue here because the instant claim is not one of ineffective assistance of trial counsel. Instead, Petitioner claims that the trial court erred in refusing to grant a mistrial and he attempts to use an ineffective assistance of counsel argument to excuse the procedural default of numerous subclaims. This situation does not fall within the ambit of Martinez, which this Court reads **narrowly** only permitting a habeas petitioner to argue that a procedurally defaulted claim of ineffective assistance of trial counsel may be heard where the cause for the procedural default was due to the ineffective assistance of post-conviction counsel. The Court believes that Martinez does not, however, apply to a habeas petitioner who argues that the procedural default of a trial court error claim, such as the one at issue here, should be excused due to the ineffective assistance of post-conviction counsel because in that situation it is clear that the cause of the default would be that of ineffective assistance of appellate counsel.

Moreover, the Court notes that a claim of ineffective assistance of appellate counsel, which could potentially excuse the procedural default of the subclaims claims here, would be

34

without merit because, as Respondents correctly point out, defense counsel did not request a mistrial based on the above-specified unexhausted grounds.   Although multiple requests for a mistrial were made throughout the course of the trial based on the prosecutor becoming a witness in the case, they were based on grounds other than the ones Petitioner presents in his habeas petition.   As such, the trial court could not have erred in denying a motion for mistrial based on arguments that were not presented and appellate counsel could not have been ineffective under the <u>Strickland</u> standard for failing to raise such a claim on appeal.   Because Petitioner is unable to establish cause for the default and he has not established the applicability of the fundamental miscarriage of justice exception, the Court will not consider the procedurally defaulted subclaims within the instant claim.

The Court will now proceed to review Petitioner's two subclaims he presented before the state courts under the appropriate standard of review.[9]   The Court will start with the Superior Court's determination, which states as follows.

> The first motion for a mistrial was made in response to the following exchange during recross examination as appellant's counsel questioned a detective regarding arrangements made by the District Attorney's Office to have a Commonwealth witness, Georgianna ("Brandy") Cotton, released from jail:
>
>> Q. MR. THOMASSEY [Attorney for Appellant]: You got her out of jail, meaning the district attorney's office with the police.
>>
>> A. DETECTIVE SMALLWOOD:   Yes because I certainly can't get anybody out of jail.

---

[9]      Although Petitioner fails in his habeas petition the subclaim involving the prosecutor essentially vouching for the credibility of Cotton, the Court notes that this subclaim was exhausted in the state courts along with the other vouching claim regarding Jerry Pratt.   Therefore, it will be addressed herein.

Q.  But you guys went to bat for her and got her out of jail?

A.  I never had a hearing, not once before a judge, on behalf of Brandy Cotton.

Q.  I mean, you in conjunction with the district attorney's office.  You guys plan a case, don't you?

A.  We certainly do an investigation, and it requires us to communicate.

Q.  When Brandy Cotton is interviewed on December 17, 1998 – or 1997, you know at that time that there's an arrest warrant out for her, since April of 1997, isn't that right?

A. I do not remember that. I don't remember that at all.

Q.  Well, she was in jail on Judge Dauer's detainer at the time of the coroner's inquest in January of 1998.

A.  You're asking me to recall something I can't recall, and probably because working on night turn, there's certain functions that are done primarily during the day and during the p.m. shift.  On night turn, actually, your other detectives in your squad are doing a lot of things.  And I just don't recall having contact with Brandy Cotton while she was in jail on a detainer.  I do know she had some issues with the court system, but I didn't go to bat for her.

Q.  Who did?

A. Who said who goes to bat for her?  I mean, it's certainly not a detective.  We cannot do that.

Q. The DA's did, the DA's office?

A. He's here to answer that question.  He certainly would know.  I don't know what he did.

MR. THOMASSEY: I ask to strike -

MR. LENHARDT: Your Honor, I'm willing to stipulate, and I've given Mr. Thomassey the documentation that shows that I was instrumental in getting Ms. Cotton out of jail.

MR. THOMASSEY:  Now can I have another DA in the case, because he's made himself a witness?

MR. LENHARDT: Your Honor, he's known that forever.

THE COURT:  Please.

Appellant contends in his brief that the comments made by the assistant district attorney "yielded a situation where, in effect, the ADA vouched for the credibility of a witness."  We disagree. The only fact offered by the prosecutor was that he was the one in the district attorney's office who had facilitated Ms. Cotton's release from jail.  The witness had just testified that she did not know what was done, or by whom, for Ms. Cotton.  In contrast, improper bolstering or vouching for witnesses by the Commonwealth occurs:

> "(1) When the prosecution places the prestige of the government behind the witness by personal assurances of the witness's veracity; and (2) when the prosecution indicates that information which is not before the jury supports the witnesses testimony." Commonwealth v. Reed, 300 Pa. Super. 224, 230, 446 A.2d 311, 314. (1982).

Commonwealth v. Hartey, 621 A. 2d 1023, 1026 (Pa. Super. 1993), *appeal denied*, 540 Pa. 611, 656 A.2d 117 (1994).

In Commonwealth v. Hartey, id., assistant district attorney John Murray testified at trial to the terms of a deal between the Commonwealth and one of its witnesses, John Barth.  Barth had testified at a preliminary hearing that it was his understanding that the Commonwealth would drop the murder charge against him if he testified against the co-defendants.   However, as the Commonwealth has a duty not to conceal the existence of an agreement with a crucial witness, John Murray, the assistant district attorney who had negotiated the agreement with Barth, was called by the prosecutor to explain the full extent of the agreement, namely, that the Commonwealth had also agreed to assist Barth in having his bail reduced and that Barth was released on bail. Hartey contended that the district attorney's testimony improperly bolstered Barth's credibility since the district attorney stated that the deal would only be valid if Barth's story was corroborated by the District Attorney's investigation.  This Court rejected Hartey's contention and opined that "in the instant case [the district attorney] expressed no personal opinion as to the truthfulness of Mr. Barth's testimony and did not refer to matters outside the evidence in relating the terms of the agreement."  Id. 621 A.2.d at 1026.   Similarly, we find that the prosecuting assistant district attorney in this case expressed absolutely no personal opinion as to the truthfulness of Ms. Cotton, and, in fact, provided much less information than the assistant district attorney in Hartey. Accordingly, we are compelled to reject appellant's claim of improper vouching.

Appellant also contends that a mistrial should have been granted because the assistant district attorney "became a potential witness when he addressed the issue of reduction of charges for the Commonwealth witness Jerry Pratt".   This claim is meritless. First, as the Commonwealth notes in its brief, "[I]n the portion of the certified record cited by appellant - pages 182 through 218 of the trial transcript - ADA Lenhardt only addressed the issue of the reduction of charges in front of Judge Zottola, not in the presence of the jury."  Secondly, the testimony regarding the Commonwealth's arrangements for Pratt came from Pratt himself. Pratt testified that he had sent a letter to the district attorney's office stating that he had information concerning the case, but in exchange for the information he asked that an unsworn

> falsification to authorities charge be reduced to a summary offense. Pratt testified that the district attorney's office withdrew the unsworn falsification charge. Pratt also testified that he had two new charges against him and that he had sought help on those as well but that he had received no promises from the district attorney's office. We find that this testimony does not equate to "the prosecution plac[ing] the prestige of the government behind the witness through personal assurances of the witness's veracity." Commonwealth v. Hartey, id. at 1026. Accordingly, the trial court, did not abuse its discretion in denying the motion for mistrial based on this testimony.

(APP 775-79.)

Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury. United States v. Lawn, 355 U.S. 339, 359 n.15 (1958). A prosecutor's vouching for the credibility of a government witness raises two concerns: 1) such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and 2) the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence. United States v. Young, 470 U.S. 1, 18 (1985); United States v. Molina-Guevara, 96 F.3d 698, 704 (3d Cir.1996). In order to find vouching, two criteria must be met:  1) the prosecution must assure the jury that the testimony of a Government witness is credible; and 2) this assurance must be based on either the prosecutor's personal knowledge or other information that is not before the jury. United States v. Walker, 155 F.3d 180, 187 (3d Cir. 1998).

On habeas review, however, prosecutorial misconduct such as vouching does not rise to the level of a federal due process violation unless it affects fundamental fairness of the trial. Lam v. Kelcher, 304 F.3d 256, 271-72 (2002). "Thus, habeas relief is not available simply because the prosecutor's remarks were undesirable or even universally condemned. The relevant question for a habeas court is whether those remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. quoting Darden v. Wainwright, 477 U.S. 168, 180-81 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Moreover, the Supreme Court has made clear that proof of prejudice is a necessary element of a due process claim. *See, e.g.* U.S. v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982); United States v. Marion, 404 U.S. 307 (1971); Jewel v. Holder, 413 F. App'x 963, 964 (9th Cir. 2011) (holding that petitioner could not demonstrate the prejudice necessary to establish a due process violation); Burkett v. Cunningham, 826 F.2d 1208, 1221 (3d Cir. 1987) ("Proof of prejudice is generally a necessary but not sufficient element of a due process claim.") (citations omitted). In determining prejudice, the Court must consider the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction. United States v. Zehrbach, 47 F.3d 1252, 1265 (3d Cir. 1995).

With respect to the first vouching claim that was exhausted involving Cotton, as noted by Respondent, even if the prosecutor's words were determined by this Court to be an improper vouching for Cotton's credibility, Petitioner cannot have suffered any prejudice because Cotton's testimony was stricken from the record. Thus, it could not have affected the fundamental fairness of the trial.

40

As to the second vouching claim that was exhausted involving Jerry Pratt, the Superior Court determined that the testimony did not amount to improper vouching because it did not equate to the prosecution placing the prestige of the government behind the witness through personal assurances.  None of the cases cited by Petitioner demonstrates that this determination is contrary to or an unreasonable application of clearly established federal law.

Moreover, the Court in Petitioner's case specifically instructed the jury as follows.

> The law requires that I repeat that the arguments of counsel are not evidence, and should not be considered as such.  However, in deciding the case you should carefully consider the evidence in lights of the various reasons and arguments which each lawyer presented.  It is the right and duty of each lawyer to discuss the evidence in a manner which is most favorable to the side they represent.  I emphasize that counsel's personal beliefs as to guilt or innocence or as to any other disputed questions are irrelevant and should not be considered.  You may be guided by each lawyer's arguments to the extent they are supported by the evidence, and insofar as they aid you in applying your own reason and common sense.  However, you're not required to accept the arguments of either lawyer.  It's for you, and you alone, to decide this case based on the evidence as it was presented, and in accordance with these instructions.  Again, Ladies and Gentlemen of the Jury, the determining factor is what you decide, the facts are from the witness stand. Anyone's opinion other than the collective opinion of this jury does not count.

(APP 610-11.)

In United States v. Lee, 612 F.3d 170, 196 (3d Cir. 2010), the Court determined that, even though the prosecutor did cross the line into improper vouching, a new trial was not warranted because it was highly probable that the error did not contribute to Lee's conviction, because, *inter alia*, the evidence at issue was of record through another witness's testimony and

the court specifically instructed the jury that "what the lawyers said is not evidence and it's not binding on you."

In Petitioner's case, the deal making concerning Pratt came from Pratt himself and the Court gave the jury a lengthy instruction concerning their responsibility to weigh only the evidence presented and not to take into account the arguments and opinion of the attorneys. As Petitioner has failed to show that the Superior Court's determination is contrary to or an unreasonable application of clearly established federal law, Petitioner has not shown that he is entitled to relief as to this claim.

**3. The trial court erred in permitting the Commonwealth to introduce evidence regarding Monte Blair.**

This claim was presented to the Pennsylvania courts through Petitioner's direct appeal, wherein the Superior Court made the following determination.

> Nor is there merit in the final argument of appellant that the trial court erred in admitting evidence concerning Monte Blair which, appellant contends was not disclosed until the third day of trial in violation of discovery rules. In his brief he contends: "Jerry Pratt, a Commonwealth witness wrote a letter to ADA Lenhardt telling him (Lenhardt) that Glenn had hired Monte Blair 'to take care of' the Commonwealth witness, Cotton. During trial it became clear that the letter had not been given to defense counsel and thereafter, the court admitted the evidence."

> At trial, Commonwealth witness Jerry Pratt testified that while he was in a holding cell with appellant at the Allegheny County Jail, appellant told him he was not worried about the witness Georgianna Cotton "because I have a person out there who can take care of her for me." Appellant mentioned to Pratt the name of Monte Blair as the person who would take care of the witness. The Commonwealth subsequently put on evidence that Blair, after being pursued by an officer for a motor vehicle violation had fled on foot from the vehicle, which contained a

Glock 21 semi-automatic handgun with thirteen live rounds and a laser sight on it on the driver's seat.

At trial, the following discussion occurred among counsel and the court regarding the letter at issue:

> MR. LENHARDT: Let me give you a little background.   I gave discovery to the public defender who originally represented the defendant. When Mr. Thomassey picked up the case I gave him discovery again. He said he lost the discovery or mislaid it, so I photocopied it all for him again.
>
> Yesterday when he was in trial he asked me if I had one report.  I looked through the discovery.  He said to point it out to him.  I did not see this letter in there, went back and photocopied it that night, gave it to him again. I tried to give him everything I had. During the course of the procedure; I didn't see the letter in there, so I photocopied it, gave it to him again.  I don't know if he had it before or not.
>
> THE COURT:  What was the gist of the letter?
>
> ****
>
> MR. LENHARDT:   Mr. Pratt wrote us a letter saying that he had information that could get the defendant life imprisonment, and he was willing to tell us that information if we dropped his false reports charge down to a fine.  He gave us that information, put it on tape, took a polygraph and passed it.  So ultimately I did better than giving him a fine, we nolle prossed that case.
>
> Subsequent to his release from jail, he was picked up on new charges.  I believe that they involved the theft of an automobile, perhaps several different types of thefts.  He wrote me another letter asking if I could take a look at those charges to see what I could do.  I have never offered him anything on those charges.   I've never been involved in negotiation of those charges.  They are still pending.

43

THE COURT:  Is that the letter he wrote where he addressed you as Rob?

MR. LENHARDT:  Yes, Your Honor.  Actually, Rob Lenhardt.  It would be the same last name as mine.

THE COURT:  I thought you had that letter, Mr. Thomassey.  You talked about that letter yesterday.

MR. THOMASSEY:  Yes, but I got it recently Judge. You handed it to me maybe two weeks ago. It wasn't in the original discovery.

MR. LENHARDT:  No, because it didn't exist at the time of the original discovery.

THE COURT:  You gave it to him two weeks ago?

MR. LENHARDT:  After I got it I mailed it to him. I think I faxed him a copy, too.

I looked through his discovery again yesterday, didn't see that letter in there, photocopied it again and gave it to him again yesterday.

Later in the trial another discussion occurred between counsel and the trial judge concerning Monte Blair:

MR. THOMASSEY [Attorney for Appellant]: . . . Mr. Lenhardt intends to put in some information concerning allegedly [sic] Mr. Blair being stopped by the Wilkinsburg police on January 26, 1998 -- is that right, Mr. Lenhardt? -- if I'm reading this correctly.

MR. LENHARDT [Assistant District Attorney]: That's the correct date, Your Honor.

MR. THOMASSEY:  I think that that -- the connection to this case of that stop is tenuous at

44

best.  The probative value is not [sic] outweighed by its prejudicial effect.

More than that, I got this information from Mr. Lenhardt yesterday.  So my thoughts would be to have Monte Blair interviewed, my thought would be to have him brought to this courtroom.

Just coincidentally, I did represent Monte Blair in the past, so I have a relationship with him.  I can talk to him.   I'm sure that there was no communication between my client and Monte Blair because it was impossible.

THE COURT: Let me stop you right there, Mr. Thomassey.

What about that, Mr. Lenhardt?

MR. LENHARDT: What's that, Your Honor?

THE COURT:  About the fact that he just got the information yesterday, and there's no ability on his part to be able to communicate with Mr. Blair and to present him as a witness.  My general inclination was at first to allow the testimony, but now I'm not so sure.

MR LENHARDT:   He did get the information yesterday, Your Honor, about the arrest of Monte Blair from me.  I photocopied all the police reports and I gave them all to him.

The -- I'm not trying to argue the rules of evidence, because as you know, we do far more than what the rules of evidence require.  But when I found out that that was the date that Monte Blair – I did know that Monte Blair had a pending gun charge, but I didn't know the date specifically, I didn't recall it.  When I went back and checked that case, found out what the date was, I photocopied them immediately and gave them to Mr. Thomassey.

45

Monte Blair has a Fifth Amendment right not to speak to Mr. Thomassey and certainly not to take the stand in this case.  Mr. Carcia is representing him in this case.

THE COURT: Let me ask you this --

MR. LENHARDT: Monte Blair's name has always been in the police reports Mr. Thomassey had, so he could have investigated.

THE COURT:  From Mr. Pratt?

MR. LENHARDT:   Yes, Your Honor.   Monte Blair's name was in there.

THE COURT: I think I'm going to allow it, deny your motion for mistrial, note your exception to my rulings.  It's preserved.  I'm going to allow the testimony.

After our careful and extended consideration of the issue, we are not persuaded of the merit of appellant's claim.  Defense counsel conceded that he received the letter at least two weeks before trial had begun, and as noted by the trial court, "the defense . . . was aware of Mr. Blair (as his name is on a police report)".  Moreover, since defense counsel had represented [him] he would have known how to contact him, this claim is rejected.

(APP 781-85.)

Under Pennsylvania law, any attempt by a defendant to interfere with a witness's testimony is admissible to show a defendant's consciousness of guilt.  *See, e.g.*, Commonwealth v. Johnson, 838 A.2d 663, 680 (2003) (finding that statements intended to influence a witness at trial demonstrated consciousness of guilt); Commonwealth v. Johnson, 668 A.2d 97, 104 (1995) (concluding that a witness's testimony that a defendant offered him a bribe not to testify at trial was admissible to show the defendant's consciousness of guilt); Commonwealth v. Goldblum,

447 A.2d 234, 243 (1982) (citing cases for the proposition that the Commonwealth may demonstrate consciousness of guilt through attempts by a defendant to intimidate or influence a witness); Commonwealth v. King, 689 A.2d 918 (1997) (holding that threats of defendant to witness were admissible).  Under this rule of law, the evidence clearly was admissible to show consciousness of guilt and Petitioner has not shown that federal law is to the contrary.

Moreover, Petitioner has failed to show any violation of discovery that would result in a decision that is contrary to or an unreasonable application of clearly established federal law. Petitioner does not dispute that the Commonwealth produced the tape of Jerry Pratt's statement naming Monte Blair some five months prior to trial.  In this statement, Pratt states that Petitioner told him that Monte Blair could take care of the witness.  Petitioner's trial counsel thus had five months to investigate Monte Blair's involvement, a former client of Mr. Thomassey's who would have talked to him.  Such an investigation would have allowed Mr. Thomassey the opportunity to have made an intelligent determination in a timely manner as to whether to continue to represent Petitioner or seek withdrawal on the basis of a conflict of interest thereby avoiding the issues he so strenuously urges in his Petition.

In short, Petitioner has failed to show even a mere violation of state law as to this claim, much less show that the Pennsylvania courts decisions are contrary to or an unreasonable application of clearly established federal law.  Thus, he is not entitled to habeas relief as to this claim.

**4.   Petitioner is entitled to a new trial based on the Commonwealth's failure to disclose the "fraudulent" transport order.**

For the reasons set forth below, this claim clearly has been procedurally defaulted.   In this regard, Petitioner received this document on July 6, 2007 in response to a discovery request granted on March 7, 2007.   In order to have met the exhaustion requirement, Petitioner should have filed a second PCRA Petition in state court raising after-discovered evidence within 60 days of the date it could have been presented.  *See* 42 Pa. Cons. Stat. §9545(b)(1)(ii).

In this case, Petitioner had 60 days from July 6, 2007, the date he received the document, to raise the issue in state court.   As his habeas Petition was then pending in this Court, he should have requested a "stay" in this Court and pursued the issue in state court.  *See* Rhines v. Weber, 544 US 269 (2005).   In that case, the Supreme Court held that when a petitioner has failed to exhaust properly a claim, the federal district court should require that he return to state court and attempt to litigate that claim there if state procedural rules still permit him to raise the claim in state court.

When a petitioner would be barred under state law from raising a claim because he failed to comply with a state procedural rule-such as a statute of limitations-the Court of Appeals for the Third Circuit has recognized that it would be "futile" to require the petitioner to return to state court.   Under that circumstance, the petitioner is technically excused from having to comply with the exhaustion requirement, but that the claim is procedurally defaulted.  *See* Slutzker v. Johnson, 393 F.3d 373, 379-80 (3d Cir. 2004); Crews v. Horn, 360 F.3d 146 (3d Cir. 2004); Lines v. Larkin, 208 F.3d 153, 166 (3d Cir. 2000) ("The equitable principles governing habeas relief will not permit [the petitioner] to create a situation in which seeking state post-conviction relief is futile, and then invoke that same futility to avoid the exhaustion requirement.").

Because Petitioner did not file a second PCRA petition he procedurally defaulted the transport order claim. There was a state procedure available to him to litigate his claim and when he did not avail himself of that procedure, he foreclosed his ability to receive federal habeas review of that claim.  *Accord* Slutzker v. Johnson, 393 F.3d 373, 379-81 (3d Cir. 2004) (holding that the failure to raise a Brady violation within the statute of limitations pursuant to the PCRA qualifies as an independent and adequate state grounds to constitute a procedurally defaulted claim).[10]  Petitioner argues that his first habeas counsel's failure to have discovered the alleged materiality of the newly discovered evidence constitutes cause such as would excuse his procedural default.  However, as the Court of Appeals for the Third Circuit has stated:

> [C]ause cannot be based on the mere inadvertence of the petitioner or petitioner's counsel to take an appeal.  The mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.

Cristin v. Brennan, 281 F.3d 404, 420 (3d Cir. 2002) (internal citations and quotations omitted).  Moreover, while ineffective assistance of counsel can be cause for a procedural default, the attorney's ineffectiveness must rise to the level of a Sixth Amendment or Fourteenth Amendment violation.  *See* Carrier, 477 U.S. at 488.  A habeas corpus proceeding is a civil proceeding to which the Sixth Amendment right to counsel afforded for criminal proceedings does not apply.  Williams v. Missouri, 640 F.2d 140, 144 (8th Cir.), *cert. denied*, 451 U.S. 990 (1981).  As there is no constitutional right to counsel in civil habeas proceedings, there can be no

---

[10]        In Slutzker, the Court of Appeals for the Third Circuit held that the petitioner had demonstrated "cause" to overcome his procedural default because neither it nor the United States Supreme Court had approved the stay and abey procedure at the time the petitioner decided to forego a second PCRA petition and instead continued to seek federal habeas review.  However, in 2005, the Supreme Court decided Rhines in which it specifically recognized the stay and abey in situations such as the one presented at bar.  Thus, after Rhines, there is no "cause" under AEDPA's statute of limitations to excuse a procedural default.

"cause" such as to excuse a procedural default for such counsel's failure to have properly exhausted a claim.

Petitioner further argues that the withholding of the evidence itself constitutes "cause" relying on several pre-AEDPA Supreme Court cases.  In particular, he relies on Strickler v. Greene, 527 U.S. 263, 289 (1999).  In that case, prosecutors told the petitioner, prior to trial, that the prosecutor's files were open to the petitioner's counsel, thus there was no need for a formal Brady motion.  The prosecution file given to Strickler, however, did not include several documents prepared by an important prosecution witness, recounting the witness' initial difficulty recalling the events to which she testified at the petitioner's trial, which could have been used to impeach the witness.  In state court post-conviction proceedings, Strickler unsuccessfully urged ineffective assistance of trial counsel based on counsel's failure to move, pretrial, for Brady material.  Answering that plea, the State asserted that a Brady motion would have been superfluous because the prosecution had maintained an open file policy pursuant to which it had disclosed all Brady material.  Based on these specific facts, the Supreme Court determined that the petitioner had shown cause for his failure to raise a Brady claim in state court because:  1) the prosecution withheld exculpatory evidence; 2) petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and 3) the State confirmed petitioner's reliance on the open file policy by asserting during state habeas proceedings that petitioner had already received everything known to the government. *Accord* Banks v. Dretke, 540 U.S. 668 (2004) (applying pre-AEDPA law).

Petitioner's situation bears no resemblance to the facts at issue in Strickler.  Petitioner's claim relies on the Commonwealth's failure to produce the transport order which resulted in

Pratt's placement in the holding cell with Petitioner on January 28, 1998.  Petitioner claims that this document proves that Pratt's presence in the holding cell with him was secured through a fraud perpetrated on the Court by the Office of the District Attorney of Allegheny County. Specifically, he claims that, in order to secure Pratt's presence in the holding cell, the District Attorney's Office falsely represented to Judge David Cercone, then a Judge of the Court of Common Pleas of Allegheny County, that Jerry Pratt had a hearing in Magistrate City Court on January 28, 1998, at 8:30 a.m.  Because the transport order indicates the reason for the transport to be a magistrate hearing, not a police interview, Petitioner asserts that there must have been a government set-up.

In response, Respondent points out that Petitioner did, in fact, have a hearing scheduled before the magistrate on January 28, 1998 and that since both Petitioner and Pratt were being transported from Western Penn on the same day, one form was filled out to procure the transfer of both inmates.   In support of this assertion, the Respondent submitted the affidavit of the clerical staff employee from the District Attorney's Office whose name appears on the form, Vicky Konesky.  In her affidavit, she avers as follows.

> 1.  My name is Vicky Konesky.  I am currently employed by the Allegheny County District Attorney's Office as a member of its clerical staff.  I have been employed in this capacity since April 1976.
>
> 2.  During the course of my employment, I have filled out numerous transfer "forms" or "petitions" which are required in order to effectuate the transfer of state inmates to Allegheny County.

3. My name and signature appear on the January 27, 1998 transfer form regarding Luther Glenn (DM2009) and Jerry Pratt (CG4505).

4. This specific form is a fill-in-the-blank form which required me to type in the transfer information. In 1998, this would have been done using a typewriter.

5. When two or more inmates were being transferred from the same prison on the same date it was a typical and common practice for me to list all of the inmates on a single form.

6. When multiple inmates were listed on a single form, it was a typical and common practice for me to include the information relevant to only one inmate's transportation. The other individual(s) would simply be added on without detailed information as to why he/she was being transported. This was done simply because of limited space available on these forms.

(ECF No. 71-1 at 37-38.)

The transfer document in this case is a far cry from the evidence at issue in Strickler, *i.e.*, undisclosed documents impeaching eyewitness testimony as to the circumstances of an abduction. It simply does not indicate that the District Attorney's Office perpetrated a fraud on the Court or that Pratt was "planted" in a holding cell with Petitioner. Thus, it does not even meet the first Strickler prong for prejudice, *i.e.*, that the evidence must be exculpatory.

More importantly, even if the Court were to find cause for the default, which it specifically does not, Petitioner cannot meet the prejudice prong to overcome the default. In this regard, the cause and prejudice inquiry parallels the merits of the alleged Brady violation itself. *See, e.g.*, Banks, 540 U.S. at 691; Strickler, 527 U.S. 263, 282 (1999); Slutzker, 393 F.3d 373, 385-86 (3d Cir. 2004). In Brady, the Supreme Court held that the suppression by the prosecution

of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  Brady, 373 U.S. at 87.  There are three components of a Brady violation:  1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; 2) that evidence must have been suppressed by the state, either willfully or inadvertently; and 3) prejudice must have ensued, in that the evidence was material to the case. If the Brady claim lacks merit, then Petitioner cannot establish prejudice.  Strickler, 527 U.S. at 282; Albrecht v. Horn, 485 F.3d 103, 132 (3d Cir. 2007); Slutzker, 393 F.3d at 385 (noting that the determination of whether the prejudice prong has been satisfied for the procedural default of a Brady claim "is identical to the analysis of materiality under Brady itself.").

In the case at bar, Petitioner has not even met his burden of showing the first component of a Brady claim.  In this regard, there simply is no basis for this Court to determine that the transport document is favorable to the accused.  Petitioner's argument is based on mere conjecture with no supporting evidence to support his serious accusation of fraud.  Moreover, Petitioner has not shown that it was suppressed by the state.  Finally, Petitioner has not made any showing of prejudice.  Specifically, he has not shown that there is a reasonable probability that the result of the trial would have been different if the transport document had been disclosed to the defense.  As Petitioner has failed to prove prejudice, his procedural default is not excused under the cause and prejudice exception.

Nor does Petitioner show that a miscarriage of justice will result.  In order to avail himself or herself of this exception to the procedural default rule, a petitioner must make a substantial showing that he or she is actually innocent of the crime for which he or she is

incarcerated.  <u>Schlup</u>, 513 U.S. at 324.  It is clear that the transport order in this action does not meet this test.  Accordingly, Petitioner has failed to demonstrate that he is entitled to relief as to his fourth claim.

   5. **Petitioner's right to counsel under <u>Massiah v. United States</u> was violated and trial counsel was ineffective for failing to move to suppress or exclude Jerry Pratt's testimony as the fruit of an illegal interrogation.**

   In his fifth claim Petitioner claims that trial counsel rendered ineffective assistance by failing to challenge the admissibility of Jerry Pratt's testimony under <u>Massiah v. United States</u>, 377 U.S. 201 (1964).  In <u>Massiah</u>, the Supreme Court held that deliberate elicitation of incriminating statements by a government agent, outside the presence of a charged defendant's attorney, violates the Sixth Amendment.  Three elements are necessary to establish such a Sixth Amendment violation: 1) the right to counsel must have attached at the time of the alleged infringement; 2) the informant must have been acting as a "government agent"; and 3) the informant must have engaged in "deliberate elicitation" of incriminating information from the defendant.  <u>Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877, 892 (3d Cir. 1999).  While the Supreme Court has not formally defined the term 'government agent' for Sixth Amendment purposes, the Court of Appeals for the Third Circuit has held that the answer depends on the facts and circumstances of each case.  <u>Matteo</u>, 171 F.3d at 893.  Specifically, there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation took place.  <u>Id</u>.

   A number of different factors should be considered when deciding whether such an agreement exists.

> First, was the informant acting under instructions from the government to obtain information from the defendant?  Second, was there a quid pro quo in which the informant received some type of benefit, even if nonpecuniary, in exchange for assisting the authorities?  Third, was there a past agency relationship between the informant and the government?  Fourth, was the informant ostensibly a mere fellow inmate, thus, hiding from the defendant the fact that he is talking to a government agent?  Fifth, was the defendant in custody at the time and, therefore, subject to the subtle influences that will make him particularly susceptible to the ploys of undercover government agents?  Finally, was the informant a trusted friend and, therefore more likely to obtain incriminating statements from the defendant?

Wallace v. Price, 265 F.Supp.2d 545, 565 -566 (W.D. Pa. 2003) (internal quotations and citations omitted), aff'd, 243 Fed. App'x. 710 (3d Cir. 2007), cert. denied, 533 U.S. 1034 (2008).

In this case, Petitioner's claim fails because he has not satisfied either the second or the third element for establishing this type of Sixth Amendment violation.  Specifically, he presents no evidence that witness Pratt was acting as a government agent when the two of them spoke at the county jail, nor has he shown that Pratt deliberately elicited incriminating information from him.  To the contrary, the record evidence indicates that Petitioner spoke to Pratt of his own accord.[11]

In reviewing this claim in Petitioner's PCRA proceeding, the trial court found as follows.

---

[11]       The Court notes that the record evidence in this case does not include the transfer order.  See Cullen v. Pinholster, 131 S. Ct. 1388 (2011), wherein the Supreme Court held that habeas "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen, 131 S. Ct. at 1398.  The Court reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made" and that therefore the record under review must be "limited to the record in existence at that same time i.e., the record before the state court."  Id.  The Court held that this reading was "compelled" by the structure of AEDPA, which it held conveyed "Congress' intent to channel prisoners' claims first to the state courts."  Id.  It held that "evidence introduced in federal court has no bearing on § 2254(d)(1) review.  If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court."  Id. at 1400.

> Petitioner's claim that Mr. Pratt's statements were unlawfully attained do not have merit in the instant case. Petitioner cites to <u>Messiah v United States</u>, 371 U.S. 201 (1962) regarding the inadmissibility of statements surreptitiously obtained by government agents after the right to counsel has attached. The so-called Massiah Rule does not apply in the present case.

> There is no indication that Mr. Pratt was a government agent. There is nothing on the record indicating that Mr. Pratt deliberately elicited incriminating statements from the petitioner while acting as a government agent. Therefore, Mr. Pratt's testimony is not impeached and the testimony is sufficient to sustain a first degree murder charge.

(APP 1019.) This determination is entitled to the AEDPA's presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). *See* <u>Wallace</u>, 265 F.Supp.2d at 565-66. "Under this provision, federal courts in habeas corpus cases must apply a presumption of correctness to state court factual findings, which the petitioner can overcome only by clear and convincing evidence. This presumption applies to the factual determinations of both state trial (including PCRA) courts and appellate courts, *see* <u>Dickerson v. Vaughn</u>, 90 F.3d 87, 90 (3d Cir.1996)." <u>Id</u>.

Moreover, this claim asserts ineffectiveness of counsel. The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 368 (1993) (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 684 (1984)). *See also* <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance:   1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. <u>Strickland</u>, 466 U.S. at

687.  The first prong of the <u>Strickland</u> test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 688.   The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable.   <u>Strickland</u>, 466 U.S. at 689.   To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   <u>Id</u>., 466 U.S. at 694.   A reasonable probability is one which is sufficient to undermine confidence in the outcome.   <u>Id</u>.   A defendant is not entitled to relief unless he makes both showings.   <u>Id</u>. at 687.   The <u>Strickland</u> standard applies equally to appellate counsel.   <u>Smith v Robbins</u>, 528 U.S. 259, 285 (2002).

In analyzing Petitioner's claims under the two-part test announced in <u>Strickland</u>, this Court must apply the standards set forth in section 2254(e) concerning the presumption of correctness applicable to state court factual findings.   The question of effectiveness of counsel under <u>Strickland</u> is a mixed question of law and fact; it requires the application of a legal standard to the historical, fact determinations.   <u>Berryman v. Morton</u>, 100 F.3d 1089, 1095 (3d Cir. 1996).   In this regard, a state court's finding that counsel had a trial strategy is a finding of fact to which the presumption applies.   <u>Id</u>.   Likewise, a state court's determination that a decision was a tactical one is a question of fact.   <u>Id</u>.   A state court's determination of whether such strategy or decision was reasonable is a question of law.   <u>Id</u>.   <i>See also</i> <u>McAleese v. Mazurkiewicz</u>, 1 F.3d 159, 166 (3d Cir.) ("[A] state court's conclusion that counsel rendered

effective assistance is not a finding of fact subject to deference by a federal court."), *cert. denied*, 510 U.S. 1028 (1993).

Here, the state PCRA court found that counsel was not ineffective for failing to raise a Messiah claim.  Petitioner has not shown that this determination is contrary to or an unreasonable application of clearly established federal law.  Consequently, he is not entitled to relief as to this claim.

6.  **Trial counsel was ineffective for failing to move to strike additional testimony that Georgianna Cotton identified the defendant from photo arrays and otherwise identified Petitioner as the shooter.**

Petitioner's habeas claim is that counsel should have objected or moved to strike six specific areas of testimony regarding Georgianna Cotton.  In his PCRA proceeding, Petitioner raised the following claim: trial counsel was ineffective for failing to object to the admission of Commonwealth evidence regarding photo arrays from which Georgianna Cotton identified him as the shooter.  (APP 990, 1006.)  In his federal habeas Petition, Petitioner further alleges that trial counsel should have moved to strike five other areas of testimony regarding Cotton.  These five additional subclaims clearly have not been exhausted and are now procedurally defaulted.

To the extent Petitioner attempts to establish cause to excuse the procedural default pursuant to Martinez v. Ryan, 132 S. Ct. 1309 (2012), by arguing that his PCRA counsel was ineffective in failing to raise these five additional subclaims in his PCRA proceedings, the Court finds that these underlying ineffective assistance of trial counsel subclaims are not "substantial" as also required by Martinez.

The five procedural defaulted subclaims at issue here are as follows.  Petitioner asserts that after the trial court struck Cotton's trial testimony, trial counsel never asked the trial court to

strike the additional evidence and comment that was received at trial that Cotton had identified Petitioner as the shooter, particularly: (1) the prosecutor's opening discussing the testimony of Cotton; (2) police testimony that Petitioner's photo was shown to Cotton because a confidential informant had identified Petitioner as the shooter; (3) police testimony that Cotton had identified the shooter as "Ray-Ray," Petitioner having been identified at trial as going by the name "Ray-Ray;" (4) police testimony that Cotton had identified the shooter as having short hair at the time of the shooting, Petitioner having been identified at trial as having short hair a few days after the shooting; and (5) police testimony that the shooter was identified by Cotton as having worn a blue jacket with yellow letters on it, Petitioner having been identified at trial as having worn a blue jacket with yellow letters on it close to the time of the murder.  Petitioner claims that "[i]f the Trial Court's remedy of striking Cotton's testimony was to have any remedial impact, all of the references to Georgianna Cotton's identification of Luther Glenn had to be excised; else the jury would conclude that *it should consider* this additional evidence in determining the guilt of Luther Glenn."  (ECF No. 53 at 60.)

Notably, four of the five procedurally defaulted subclaims involve police officers' testimony regarding Cotton or information the police received from Cotton.  Respondents assert that this testimony was admissible for the purpose of establishing the course of the police investigation leading up to Petitioner's arrest, but Petitioner counters that once Cotton's testimony was stricken the course of the investigation was simply not relevant in this case and was prejudicial to the proper considerations at trial.  The Court disagrees.

In Pennsylvania, "[i]t is well established that certain out-of-court statements offered to explain the course of police conduct are admissible on the basis that they are offered not for the

truth of the matters asserted but rather to show the information upon which police acted."
Commonwealth v. Jones, 658 A.2d 746, 751 (Pa. 1995).  The police testimony regarding Cotton
and the information received from Cotton was admissible for the purposes of establishing the
course of the police investigation and police conduct.  In fact, the nature of the testimony was
limited to the course of conduct because it provided the jury with a complete picture of the
investigation and did not go beyond what was reasonably necessary to explain this conduct.  The
fact that Cotton's testimony was subsequently stricken does not render this testimony
inadmissible.  As such, trial counsel cannot be deemed ineffective for failing to object to the
contested police testimony regarding Cotton.

Additionally, contrary to Petitioner's contention, the police investigation was not
irrelevant simply because the testimony of Cotton was stricken.  In fact, one could argue that
once Cotton's testimony was stricken, the nature of the police investigation became even more
relevant to the case and beneficial to the defense in that it was somewhat discredited by Cotton's
inconsistent statements.  It appears to the Court that this was more prejudicial to the
Commonwealth as the police relied in part on the information provided to them by Cotton and
the veracity of this information was later challenged when she took the stand and was unable to
remain consistent in her testimony.

Petitioner also contends that trial counsel should have moved to strike the prosecutor's
opening statements discussing the expected testimony of Cotton; however, Petitioner cannot
show prejudice in this regard because the trial judge gave clear instructions to the jury to
disregard Cotton's testimony in its entirety and this instruction was again reiterated in the trial

judge's closing charge.  Moreover, the jury was advised that the arguments of counsel are never considered evidence.

Because Petitioner has failed to demonstrate that his underlying procedurally defaulted ineffective assistance of trial counsel subclaims are substantial as required by <u>Martinez</u>, the Court finds that he has failed to establish cause to excuse their default.  Additionally, Petitioner has not shown applicability of the fundamental miscarriage of justice exception.  As such, these five subclaims are barred from habeas review.

The Court will proceed to review only the exhausted subclaim within the instant claim. In this regard, the Superior Court made the following determination.

> Appellant's third contention is that trial counsel was ineffective for failing to object to the admission of photographic arrays compiled by police and viewed by Ms. Cotton prior to Appellant's arrest. Appellant argues that the arrays, which included photographs of Appellant were highly prejudicial because Ms. Cotton's testimony was stricken in its entirety by the trial court. Essentially, Appellant claims that since Ms. Cotton's testimony was stricken, the photographs, which Ms. Cotton used to identify Appellant as the perpetrator, were inflammatory and inadmissible.

> \*\*\*\*

> After Ms. Cotton implicated Appellant in the shooting, the prosecutor asked her if police showed her a series of photographic arrays to identify the perpetrator.  When Ms. Cotton replied in the affirmative, the prosecutor presented her with two trial exhibits consisting of sixteen photographs; Ms. Cotton studied the photographs and misidentified the man pictured in photograph number three of Commonwealth's exhibit 29 as Appellant.  During subsequent questioning, Ms. Cotton had difficulty finding Appellant's picture among the various photographs.  When the prosecutor finished his direct examination, the court dismissed the jury, and trial counsel made a motion to strike Ms. Cotton's testimony based upon the misidentification.  The court denied the

motion and ordered the jury to be brought back to the courtroom. Trial counsel then cross-examined Ms. Cotton.

****

We now return to the issue at hand, *i.e.*, Appellant's assertion that trial counsel was ineffective for failing to object to the admission of the photographic arrays viewed by Ms. Cotton. The PCRA court rejected this argument reasoning that: (1) the photographs, which were admitted into evidence before Ms. Cotton took the witness stand, were admissible to establish the course of the police investigation; (2) the jury was instructed to disregard Ms. Cotton's testimony in its entirety; (3) the assistant district attorney did not mention the photographs during his closing argument; and (4) assuming *arguendo* that the photographs were admitted in error, their admission was not so prejudicial as to warrant the grant of a new trial because the Commonwealth presented additional evidence implicating Appellant in the murder, including Jerry Pratt's testimony that Appellant admitted shooting the victim.

We agree with the court's determination and adopt its reasoning as our own. At a minimum, Appellant cannot establish that the outcome of the trial would have been different if the photographs had been excluded. Like the PCRA court, we fail to see how the photographs, standing alone, were so inflammatory as to warrant the grant of a new trial, especially where, as here, the jury was instructed to disregard the testimony of the witness who viewed them. Moreover, another prosecution witness, Jerry Pratt, directly implicated Appellant in the shooting. Accordingly, we find that Appellant cannot satisfy the prejudice prong of the ineffective-assistance-of-counsel test, and no relief is due.

(APP 1034-38) (internal citations omitted).

Petitioner has failed to show that this decision is contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Thus, he is not entitled to relief as to this claim.

**7.   The trial court and trial counsel failed to adequately advise Petitioner about his right to testify at trial and Petitioner's decision not to testify as trial was not knowing, intelligent and voluntary.[12]**

In this claim, Petitioner asserts, *inter alia*, that trial counsel was ineffective for failing to ensure that, in waiving his right to testify, the court explained that Petitioner could not be cross-examined regarding his prior criminal history.[13]

This claim was first raised in Petitioner's *pro se* PCRA Petition.  Specifically, Petitioner claimed that counsel erroneously advised him that if he took the stand to testify in his own defense, the Commonwealth would be able to bring out his prior robbery conviction during *cross examination*.  Petitioner cited to 42 Pa. C.S. § 5918, which provides in pertinent part:

> No person charged with any crime and called as a witness in his own behalf, shall be asked, or if asked, shall be required to answer any question tending to show that he has committed, or been charged with, or been convicted of any offense other than the one wherewith he shall then be charged, or tending to show that he has been of bad character or reputation unless:
>
> (1) he shall have at such trial, personally or by counsel, asked questions of the witness for the prosecution with a view to establish his own good reputation or character, or has given evidence tending to prove his own good character or reputation; or

---

[12]     On September 1, 2011, this Court held a status conference and ordered that an evidentiary hearing be held with respect to this claim.  The hearing was held on December 7 and 9, 2011.  However, in <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388 (2011), the Supreme Court limited the possibility of an evidentiary hearing in district court to cases where § 2254(d)(1) does not bar federal habeas relief.  <u>Id</u>. at 1401.  Pursuant to <u>Pinholster</u>, "review under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  <u>Id</u>. at 1398.  The Court finds that the evidentiary hearing held in this case was not warranted because, as discussed hereinafter, this claim was adjudicated on the merits in state court and Petitioner is not entitled to relief under § 2254(d)(1).  As such, pursuant to the strictures announced in <u>Pinholster</u>, the Court will not consider the evidence presented at the hearing in its assessment of the instant claim.

[13]     Petitioner was charged with robbery as a juvenile for an incident that occurred in Allegheny County when he was eleven years old.  Additionally, Petitioner had a prior adult criminal conviction for robbery at the time of his trial.

> (2) he shall have testified at such trial against a co-
> defendant, charged with the same offense.

42 Pa. C.S. § 5918.  He maintained that he did not fit within any of the aforementioned criteria

by which to allow reference to his prior conviction.   He further cited to <u>Commonwealth v.

Nieves</u>, 746 A.2d 1102 (2000), and <u>Commonwealth v. Garcia</u>, 712 A.2d 746 (1998), to support

his position that the Commonwealth would not have been able to introduce evidence of his prior

conviction via cross-examination.    Additionally, he claimed that the trial court erroneously

informed him on the law governing testifying on his own behalf, specifically that the

Commonwealth could cross examine him about his prior criminal history involving crimes of

deception or falsehood.  Petitioner claimed that had he been correctly instructed by trial counsel

and the trial court, he would have taken the stand to testify in his own defense.  (APP 837-843.)

After Petitioner filed his *pro se* PCRA Petition, appointed counsel filed an Amended

PCRA Petition which raised the following claim:

> The defendant claims counsel was ineffective in counseling the
> defendant not to testify, thereby rending him incapable of making a
> knowing and voluntary waiver of his right to testify.  Specifically,
> defendant believes and avers that trial counsel incorrectly advised
> him regarding the use of his prior record specifically regarding the
> type of prior convictions that could be used and how.  Therefore,
> defendant could not make a knowing waiver of his right to testify.

(APP 911-12.)   After the PCRA Petition was denied, the claim was raised in Petitioner's

Statement of Matters Complained of Pursuant to Pa. R.A.P. 1925(b), and with regard to this

claim the PCRA trial court concluded that the claim should be dismissed.   Specifically, the

court's Opinion stated in pertinent part:

> The petitioner's third allegation is that trial counsel was
> ineffective in the advice given him relevant to his testimony at

trial.  The petitioner plead that trial counsel gave him inaccurate information regarding the use of his prior record and how the Commonwealth could use those convictions to support a case against him.

The Superior Court of Pennsylvania has ruled on this issue in Commonwealth v. Bazabe, 404 Pa. Super. 408, 590 A.2d 1298 (1991).  In Bazabe, the defendant claimed counsel was ineffective for failing to call him to the stand.  The court held that the petitioner had to demonstrate that:

> "1) counsel interfered with his client's freedom to testify, or 2) counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision by the client not to testify on his own behalf."

Id. at 1301.  In addition, the Pennsylvania Superior Court held in Commonwealth v. Wertelet, 446 Pa. Super. 352, 666 A.2d 1087 (1995) that a defendant's decision to testify is ultimately to be made after full consultation with defense counsel.

Here the petitioner claims trial counsel gave inaccurate advice upon which he based his decision not to testify and, in the certified statement, trial counsel states that he has no specific recollection but he would have advised petitioner of the law and petitioner made the ultimate decision after consultation was counsel.  The record reflects trial counsel requested the opportunity to confirm his decision not to testify at the conclusion of the trial and that this Court conducted an on-record colloquy regarding such.  The record noted during the colloquy that the petitioner chose not to testify in part because of his *crimen falsi* convictions and the fact that the Commonwealth could submit such into evidence.

The petitioner's argument, however, cites to Commonwealth v. Nieves, 560 Pa. 529, 746 A.2d 1102 (Pa. 2000).  In Nieves, the court held the defendant was incapable of making a knowing and voluntary waiver because he was not correctly advised of his right to testify.  The court held:

> The decision of whether or not to testify on one's own behalf is ultimately to be made by the

> defendant after full consultation with counsel. In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf.

Id. at 1104.

The Nieves court further held that a claim of ineffectiveness cannot be evaluated in hindsight. Id. at 1006 n.7. The court references Commonwealth v. Washington, 549 Pa. 12, 700 A.2d 400 (1997). In Washington, the court held all that is needed to be determined is, "whether the course of action chosen by trial counsel at the time of trial had some reasonable basis designed to effectuate his client's best interests, and, if so, we will deem counsel effective and our inquiry ends." Id. at 410.

> The petitioner's use of Nieves is ultimately unconvincing and accordingly, there is no merit to the petitioner's claim. In the present case, the record indicates a colloquy regarding the petitioner's right to testify. Furthermore, petitioner's trial counsel indicated that he was certain that he appraised the petitioner of his rights correctly as to what the law in the matter was and that the petitioner's decision not to testify was his own. There is no indication of unreasonableness on the part of petitioner's trial counsel and, therefore, the claim of ineffectiveness must be dismissed.

(APP 986-88) (internal citations to the record omitted).

On appeal, the Superior Court made the following determination:

> Appellant initially contends that an evidentiary hearing is warranted to determine if trial counsel provided "adequate advice relevant to whether or not [Appellant should] testify at his trial." This claim is premised on the assertion that trial counsel erroneously informed Appellant that if he testified in his own defense, the Commonwealth would be permitted to introduce evidence of Appellant's prior robbery conviction for impeachment purposes.

66

****

In the instant case, the record reveals that the trial court conducted an on-the-record colloquy to determine whether Appellant's waiver of his right to testify was knowing and voluntary. During the colloquy, Appellant informed the court that he was:  (1) twenty-one years old; (2) attending classes in preparation for college; (3) capable of reading, writing, and understanding the English language; (4) not under the influence of drugs or alcohol; (5) not suffering from a mental or physical impairment that would affect his cognitive abilities; (5) aware that the offense charges carried a maximum penalty of life imprisonment; (6) aware that he had a constitutional right to testify on his own behalf.  Thereafter, the following exchange occurred:

> THE COURT:  Is it your decision to testify or not testify in this matter?
>
> MR. GLENN:  My decision not to testify.
>
> THE COURT:  Have you discussed it with [trial counsel]?
>
> MR. GLENN: Yes, I have, sir.
>
> THE COURT:  Are you satisfied with his representation?
>
> MR. GLENN: Yes, I am, sir.
>
> THE COURT:  Has anyone threatened you, forced you, promised you anything in return for your decision not to testify?
>
> Mr. GLENN:  No, they haven't, sir.
>
> THE COURT:  You understand that you cannot later complain if you are convicted that you should have taken the stand to testify, because this is your one and only chance to decide that.  You understand that?
>
> MR. GLENN:  Yes, sir.

[PROSECUTOR]:  Perhaps the Court can inquire as to whether part of his decision in doing so is the *crimen falsi* that may come up as a result of his testimony, Your Honor.

THE COURT: You understand that, as part of your reasoning or decision not to testify, the fact that the district attorney [sic] if you take the stand, can cross-examine you about your prior criminal history involving crimes of deception or falsehood?  You understand that?

MR. GLENN: Yes, sir.

THE COURT:  Is that part of your reason not to testify?

MR. GLENN: Yes, sir.

THE COURT: Is that part of the reason that character witnesses are not present in this case?

[TRIAL COUNSEL]:   That's exactly it, your Honor.

TH E COURT:  Anything else?

[PROSECUTOR]:         Your    Honor,    the Commonwealth can't technically cross-examine him directly about those but we could enter into evidence   the   previous   alleged   *crimen   falsi* adjudication and convictions.

THE COURT: All right. I understand that. I think he understands that, too. Is there anything else for Mr. Glenn?

[TRIAL COUNSEL]:  No.

The PCRA court rejected Appellant's ineffectiveness claim on the rationale that Appellant knowingly and intelligently waived his right to testify and that counsel's advice was reasonable in light

of the fact that the Commonwealth would have been permitted to introduce evidence of prior *crimen falsi* convictions if Appellant had taken the stand.  We agree with the court's assessment. Contrary to Appellant's position, his robbery conviction would have been admissible for impeachment purposes if he had testified. Thus, Appellant's underlying claim, *i.e.*, that trial counsel provided erroneous advice concerning the admissibility of the robbery conviction for impeachment purposes, lacks arguable merit.

(APP 1030-33) (internal citations omitted).

A brief explanation of Pennsylvania law in this area is necessary before beginning review of the instant claim.  First, pursuant to 42 Pa. C.S. § 5918, the Commonwealth is prohibited from cross examining a criminal defendant about a prior conviction and is permitted to admit evidence of a proper prior conviction only on rebuttal, unless the defendant has placed his character at issue or has testified against a codefendant.  However, the Commonwealth is permitted to automatically introduce against a testifying defendant evidence of prior convictions for an offense involving dishonesty or false statement, *crimen falsi*, unless the convictions were more than 10 years old.  *See* Pa. R.E. 609; *see also* <u>Commonwealth v. Randall</u>, 528 A.2d 1326, 1329 (1987).  Such evidence, however, may only be admitted on rebuttal unless the defendant has brought into question his good character and reputation during his testimony.  Additionally, Pennsylvania law recognizes robbery as a crime involving dishonesty.  *See* <u>Commonwealth v. Strong</u>, 563 A.2d 479 (1989) (holding Commonwealth may use robbery conviction to impeach defendant's credibility because robbery involves elements of dishonesty).  As such, in this case, the Commonwealth would have been permitted to automatically introduce evidence of Petitioner's prior adult conviction for robbery on rebuttal and permitted to introduce the evidence

on cross examination if he had put into question his good character and reputation.  *See* Commonwealth v. Bullock, 948 A.2d 818, 827-28 (Pa. Super. Ct. 2008).

Secondly, under 42 Pa. C.S. § 6354(b)(4), *crimen falsi* offenses are admissible for impeachment purposes, even where they were as a juvenile as long as they were within the ten-year period prior to the testimony.  *See* Commonwealth v. McKeever, 689 A.2d 272 (Pa. Super. Ct. 1997); *see also* Pa. R.E. 609(d) ("In a criminal case only, evidence of the adjudication of delinquency for an offense under the Juvenile Act, 42 Pa. C.S. §§ 6301 *et seq*., may be used to impeach the credibility of a witness if conviction of the offense would be admissible to attack the credibility of an adult").  However, such evidence is only admissible if the child was adjudicated delinquent for purposes of an offense.  *See* 42 Pa. C.S. § 6354(b)(4); *see also* Pa. R.E. 609(d).  In Petitioner's case, it appears as if he was not adjudicated delinquent for the robbery offense but instead found to be a dependent child.  If such were the case, as it is unclear from the record, it is doubtful that such evidence would have been admissible.

In his habeas petition, Petitioner contends that the PCRA courts failed to accurately comprehend his argument, believing that he was instead challenging whether his prior robbery adjudication was a proper *crimen falsi* conviction.  Therefore, he asserts the state courts did not apply the proper law to the case.  Specifically, Petitioner claims that his claim is not that his trial counsel was ineffective for failing to object to a prior robbery adjudication being used against him, but is instead, and always has been, that trial counsel was ineffective for failing to ensure that in waiving his right to testify, the trial court correctly explained that Petitioner could not properly be *cross examined* with regard to his prior criminal history.  Further, Petitioner asserts that the entire thrust of his argument is that his decision to waive his right to testify was abridged

by the trial court's inaccurate description of Pennsylvania law and by his trial counsel's ineffectiveness in failing to object or otherwise intervene in the misstatement.

A criminal defendant has a constitutional right to testify on his own behalf, a right which may only be waived by the defendant.  Rock v. Arkansas, 483 U.S. 44, 50-53 (1987); United States v. Pennycooke, 65 F.3d 9, 10 (3d Cir. 1995).  Because the right to testify finds its foundation in the Constitution and the mandates of Due Process, a defendant's waiver of that right must be voluntary, knowing and intelligent.  Pennycooke, 65 F.3d at 11.  The duty of providing such advice on whether to testify and ensuring that any waiver is knowing and intelligent rests with defense counsel.  Id. at 12.  A presumption remains, however, that where a defendant is represented by counsel, counsel has presumably discussed the defendant's right to testify with him, and defendant voluntarily and intelligently waived that right.  See United States v. Hatcher, No. 94-173-1, 1997 U.S. Dist. LEXIS 18043, at *9 (E.D. Pa. Nov. 6, 1997) (citing Pennycooke, 65 F.3d at 12-13.)  Consequently, to succeed on a claim of ineffective assistance for failure to allow a defendant to testify, the petitioner must overcome these presumptions.  Id. Moreover, in order to demonstrate prejudice for a claim of ineffective assistance for failure to allow a defendant to testify, a petitioner must put forth more than a "bald assertion" that he was not allowed to testify, including some specifics as to what his testimony would have been. Palmer v. Hendricks, 592 F.3d 386, 399 (3d Cir. 2010) (holding that petitioner's mere stated desire to tell his side of the story "falls far short of satisfying Strickland's prejudice element.").

Contrary to Petitioner's position, the Court cannot reasonably conclude that the Pennsylvania state courts misconstrued this claim.  Rather, it is clear that the state courts evaluated the claim that was presented before them – whether trial counsel was ineffective in the

advice given to Petitioner relevant to his testimony at trial in that trial counsel incorrectly advised him regarding the type of prior convictions that could be used against him and how. Upon a painstaking review of Petitioner's post-conviction pleadings, it appears as if PCRA counsel never specified as to the exact incorrect information trial counsel allegedly gave Petitioner regarding his testimony and use of his prior record, *i.e.*, that it could be admitted on *cross-examination*, and instead he just pled in general terms that trial counsel gave inadequate advice in this regard rendering Petitioner's decision not to testify invalid. In light of the on-the-record colloquy confirming Petitioner's decision not to testify, in which Petitioner specifically stated that his decision was made in part because of his *crimen falsi* convictions and the fact that the Commonwealth could submit such into evidence, and because there was no indication of unreasonableness on the part of trial counsel, the state courts reasonably concluded that Petitioner's failure to testify was not the product of constitutionally deficient advice from counsel. On habeas review, Petitioner has not met his burden under 28 U.S.C. § 2254(d) to show that the state court's rejection of this claim amounted to an unreasonable application of Strickland.

Moreover, even had Petitioner's PCRA counsel clarified this claim so as to specify the alleged incorrect advice given to Petitioner by his trial counsel, this Court could still not reasonably conclude that the trial court's misstatement of Pennsylvania law or that trial counsel's failure to object or otherwise intervene to correct the trial court's misstatement rendered Petitioner's waiver of the right to testify invalid. Although the Court agrees that the mandates of 42 Pa. C.S. § 5918 are strict and that Pennsylvania courts have always honored the rule, reversing convictions where such an error occurred, this is not a situation where such a violation

did, in fact, occur.  Rather, in this case, the trial judge misstated the law regarding the manner in which Petitioner's prior record could come in and this misstatement was *immediately* corrected by the prosecutor.  It logically follows then, that even had trial counsel improperly instructed Petitioner on the law prior to the court's colloquy, as Petitioner would have this Court believe despite evidence in the record to the contrary, he is unable to demonstrate prejudice due to the prosecutor's clarifying interjection.    Furthermore, the on-the-record colloquy clearly demonstrates that Petitioner chose not to testify in part due to the fact that evidence of his prior *crimen falsi* convictions could be introduced.  Because of this, the Court cannot reasonably conclude that, assuming counsel had given incorrect information and the prosecutor did not interject, Petitioner's decision regarding his right to testify would have been different because evidence of his prior adult robbery conviction could have been admitted on rebuttal had he elected to testify.  Accordingly, Petitioner is unable to establish that his waiver of the right to testify was rendered invalid by the trial court's misstatement of the law and trial counsel's alleged inadequate advice.

### 8. Appellate counsel was ineffective for failing to challenge the weight and the sufficiency of the evidence on appeal.

Petitioner claims that appellate counsel rendered ineffective assistance by failing to challenge the weight and the sufficiency of the evidence on appeal.  As noted by Respondents, Petitioner raised this claim in his Amended PCRA Petition and the PCRA court rejected the claim finding sufficient evidence to support a first degree murder conviction.  Petitioner then raised this claim in his Rule 1925(b) Statement of Matters Complained of on Appeal; however, he did not pursue it on appeal by including it within his appellate brief.  Consequently, this claim

has not been exhausted, and at this point, is procedurally defaulted.  *See*, *e.g.*, <u>Charlton v. Wakefield</u>, No. 07-200, 2010 U.S. Dist. LEXIS 17957, 2010 WL 724521 at *10 (W.D. Pa. March 1, 2010) (Although raised in his post-trial motion and in his Rule 1925(b) Statement, petitioner's sufficiency of the evidence claim was not exhausted and procedurally defaulted because he did not present it in his brief filed with the Superior Court as required by Rules 2111 and 2116 of the Pennsylvania Rules of Appellate Procedure).

Petitioner's failure to properly raise and address this claim in his appellate brief in compliance with Pennsylvania Rule of Appellate Procedure 2116(a)[14] precluded the Superior Court's review of the claim and constitutes waiver under state law.  *See* <u>Commonwealth v. Einhorn</u>, 911 A.2d 960, 969 n.2 (Pa. Super. 2006) ("Because this particular claim was not included in his statement of questions in his brief, we are constrained to find it waived."); <u>Thomas v. Elash</u>, 781 A.2d 170, 176-77 (Pa. Super. 2001) ("Although Appellant may have preserved the issues raised in his post trial motions by mailing the motions within 10 days of the verdict, he has now waived those issues by failing to include them in his brief to this Court . . . . Having failed to properly raise and address the issues in his brief, Appellant has precluded our review of his substantive claims."); <u>Commonwealth v. Kittelberger</u>, 616 A.2d 1, 3 n.6 (Pa. Super. 1992) ("[T]his particular claim is waived because appellant failed to properly preserve it for appellate review by specifically including it in his statement of questions.")  The procedural default doctrine bars federal habeas review where, as here, the petitioner has failed to comply

---

[14]     Pennsylvania Rule of Appellate Procedure 2116(a) mandates that an appellant must present all issues on appeal in the Statement of Questions Involved section of his brief.  At the time of Petitioner's PCRA proceedings, Rule 2116(a) provided, in relevant part: "This rule is to be considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in the statement of questions or involved or suggested thereby."

with the state's procedural rules when raising the claim at issue before the state courts, whether this failure occurred at trial, on appeal, or during post-conviction review.  Edwards, 529 U.S. at 451.  The doctrine prohibits federal habeas courts from reviewing a state court decision involving a federal question if the state court decision is based on a rule of state law that is "independent" of the federal question and "adequate" to support the judgment.  See, e.g., Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman, 501 U.S. at 732.

The Supreme Court has stated that a state rule of procedure is "independent" if it does not depend for its resolution on answering any federal constitutional question.  See, e.g., Ake v. Oklahoma, 470 U.S. 68, 75 (1985).  That is the case here. Pennsylvania's rule of waiver for failing to raise an issue on appeal is "independent" of any federal law question.  See, e.g., DiVentura v. Stepniak, No. 95-CV-0443, 1996 U.S. Dist. LEXIS 2808, 1996 WL 107852, at *3 (E.D. Pa. March 11, 1996) (finding state court's application of the waiver rule to be "independent" of federal law).  The Supreme Court has also stated that a state rule is "adequate" if it is "firmly established and regularly followed" at the time that the alleged procedural default occurred.  Ford v. Georgia, 498 U.S. 411, 423-24 (1991); see also Nara v. Frank, 488 F.3d 187, 199 (3d Cir. 2007) (a state rule is adequate when a state appellate court reviewing the petitioner's claim refused to review it on the merits because the petitioner failed to comply with the rule and the state court's refusal was consistent with other decisions).  The Supreme Court recently held:

> [A] discretionary state procedural rule can serve as an adequate ground to bar federal habeas review.  Nothing inherent in such a rule renders it inadequate for purposes of the adequate state ground doctrine.  To the contrary, a discretionary rule can be "firmly established" and "regularly followed" – even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others.  See Meltzer, State Court Forfeitures of Federal Rights, 99 Harv. L.

Rev. 1128, 1140 (1986) ("[R]efusals to exercise discretion do not form an important independent category under the inadequate state ground doctrine").

A contrary holding would pose an unnecessary dilemma for the States: States could preserve flexibility by granting courts discretion to excuse procedural errors, but only at the cost of undermining the finality of state court judgments. Or States could preserve the finality of their judgments by withholding such discretion, but only at the cost of precluding any flexibility in applying the rules.

Beard v. Kindler, 130 S. Ct. 612, 618 (2009). The state rule at issue here qualifies as "adequate" because, although it appears it may have been discretionary, it was firmly established and regularly followed in non-capital cases at the time Petitioner's default occurred. *See*, *e.g.*, Commonwealth v. Poplawski, 852 A.2d 323, 326 n.3 (Pa. Super. 2004); Commonwealth v. Adrulewicz, 911 A.2d 162, 164 n.7 (Pa. Super. 2006); Commonwealth v. Jarowecki, 923 A.2d 425, 428 (Pa. Super. 2007), *reversed on other grounds*, 985 A.2d 955 (Pa. 2009). Hence, Petitioner's waiver under state law constitutes a procedural default for purposes of seeking federal habeas relief.

As previously stated, this federal court may not review a defaulted claim unless Petitioner demonstrates cause and prejudice for his default or establishes a fundamental miscarriage of justice. Edwards, 529 U.S. at 451. Petitioner claims that PCRA counsel's ineffectiveness should excuse his procedural default under the cause and prejudice exception pursuant to Martinez v. Ryan, 132 S. Ct. 1309 (2012). However, Martinez's narrow holding that ineffective assistance of counsel at initial-review collateral proceedings may establish cause to excuse procedural default of a claim of ineffective assistance does not apply to the situation presented here. Petitioner's claim of ineffective assistance of appellate counsel for failing to challenge the weight and sufficiency of the evidence direct appeal was advanced by Petitioner's PCRA counsel

at his initial-review collateral proceeding before the PCRA trial court.  His claim, although presented in his Rule 1925(b) Statement, was not included within his appellate brief.  "The holding in [Martinez] does not concern attorney errors in other kinds of proceedings, including appeals from initial review collateral proceedings . . . ."  Martinez, 132 S. Ct. at 1320.  As such, such an argument does not establish cause for the procedural default here.  See No. 10-3985, Hood v. Folino, 2012 U.S. Dist. LEXIS 55989, *4-5 (E.D. Pa. April 19, 2012) (discussing applicability of Martinez when PCRA counsel failed to raise ineffective assistance of counsel claim on appeal from the denial of PCRA relief).

As Petitioner has established neither cause nor prejudice to excuse the procedural default and has not demonstrated the applicability of the miscarriage of justice exception, this claim is barred from habeas review.

**9.  Trial counsel was ineffective for failing to conduct an adequate pretrial investigation into an alibi defense and for failing to present the defense at trial.**

Petitioner claims that trial counsel rendered ineffective assistance by failing to present an alibi defense at trial.  Petitioner raised this claim in his PCRA petition but failed to include it in his Rule 1925(b) Statement of Matters Complained of on Appeal.  Consequently, the Superior Court held that this claim was waived.

Petitioner concedes that this claim was not properly exhausted in state court but argues that the claim is not procedurally barred because the failure to review appellate issues not raised in a Rule 1925(b) Statement is not regularly applied by Pennsylvania courts and is therefore not an independent and adequate ground for finding procedural default.  In support, Petitioner relies on Commonwealth v. Aponte, 855 A.2d 800, 802 n.1 (Pa. 2004), wherein the Pennsylvania

Supreme Court considered the appellant's claim challenging the legality of his sentence despite having failed to raise it in the trial court or in his Rule 1925(b) statement.  While it is true that under Pennsylvania law a challenge to a sentence premised on implications of legality cannot be waived on appeal, *see e.g.*, Commonwealth v. Walker, 362 A.2d 227, 330-31 (Pa. 1976), Petitioner's claim at issue here was premised on no such implications but instead on the validity of his conviction underlying his sentence.  Therefore, his failure to raise it in his 1925(b) Statement constituted a waiver of the claim under Pennsylvania state procedural rules.  *See* Commonwealth v. Lord, 719 A.2d 306, 308 (Pa. 1998); *see also* Commonwealth v. Butler, 812 A.2d 631, 633 (Pa. 2002) (holding that Lord "eliminated any aspect of discretion and established a bright-line rule for waiver under Rule 1925").

Contrary to Petitioner's argument, waiver of a claim for failure to comply with the requirements of Pa. R.A.P. 1925(b) and identify all issues to be reviewed on appeal has been found to be adequate and independent grounds for the purpose of procedural default.  Edwards v. Wenerowicz, No. 11-3227, 2012 U.S. Dist. LEXIS 21908, 2012 WL 568849, at *4 (E.D. Pa. Jan. 31, 2012) ("The Third Circuit has specifically recognized that a failure to comply with Rule 1925(b) and identify all issues to be reviewed on appeal resulting in waiver at the state court level constitutes procedural default on independent and adequate state grounds.") (citing Buck v. Colleran, 115 F. App'x 526, 528 (3d Cir. 2004)), *report adopted by*, No. 11-3227, 2012 U.S.Dist. LEXIS 21908, 2012 WL 569015 (E.D. Pa. Feb. 22, 2012); *see also* Diggs v. Diguglielmo, No. 06-24, 2007 U.S. Dist. LEXIS 84852, 2007 WL 4116311, at *11 (E.D. Pa. Nov. 15, 2007) (waiver a claim for failure to raise it in Rule 1925(b) statement is an independent and adequate state law ground); Jones v. Lavan, No. 02-2359, 2002 U.S. Dist. LEXIS 23715, 2002 WL

78

31761423 at *2 (E.D. Pa. Dec. 9, 2002) (same).   Consequently, this claim is procedurally defaulted for federal habeas purposes.

To the extent Petitioner contends that PCRA counsel's ineffectiveness should excuse his procedural default pursuant Martinez v. Ryan, 132 S. Ct. 1309 (2012), he is provided no relief because PCRA counsel advanced this claim in his initial-review proceeding before the PCRA trial court and Martinez does not apply to claims of ineffective assistance of appellate PCRA counsel.  See claim 8, supra.  Moreover, Petitioner is afforded no relief to the extent he claims that a fundamental miscarriage of justice excuses his default because he is actually innocent.  As previously noted, a fundamental miscarriage of justice exists where the petitioner can demonstrate actual innocence.  However, to rely on this exception, a petitioner must "support his allegations of constitutional error with 'new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'"  Hubbard, 378 F.3d at 339-40 (quoting Schlup, 513 U.S. at 324).  Moreover, the petitioner must "show it is more likely than not that no reasonable juror would have convicted him in light of the new evidence presented in his habeas petition."  Id. at 339 (quoting Calderon v. Thompson, 523 U.S. 538, 559 (1998)).

Although unclear, Petitioner appears to claim that the evidence trial counsel was ineffective for failing to obtain and present in support of an alibi defense – specifically, phone records to corroborate his story that he was on the other side of town attempting to arrange bail for his brother at the time the crime occurred and testimony from Michelle Saula, an employee of Steve Savor's Bail Bond Agency, who would have testified that an individual had called the agency regarding bail for Petitioner's brother in the early morning hours of December 17, 1997 –

is "new reliable evidence" that establishes his innocence.  However, because this evidence was known and available at the time of trial, Petitioner's arguments amount to an impermissible attempt to circumvent the Third Circuit's definition of "new" in Houck v. Stickman, 625 F.3d 88 (3d Cir. 2010), by arguing that counsel was ineffective for failing to present the evidence to the trial court.

In Houck, the Third Circuit adopted the general rule that "evidence is new only if it was not *available* at trial and could not have been discovered earlier through the exercise of due diligence." Houck, 625 F.3d at 93-94 (emphasis added) (adopting the Eighth Circuit's definition of new evidence articulated in Amrine v. Bowersox, 128 F.3d 1222, 1230 (8th Cir. 1997)).  The Court specified one narrow limitation to its definition to include evidence that was not discovered by an ineffective counsel even though the petitioner may in fact be relying on that very failure as the basis for his claim.  *See* id. at 94. ("[I]f the evidence was not discovered for use at trial because trial counsel was ineffective, the evidence may be regarded as new provided that it is the very evidence that the petitioner claims demonstrates his innocence.")  However, this narrow limitation is inapplicable here because Petitioner's claim is that counsel was ineffective for failing to present, not discover, evidence that was already known.

In this case, not only was this evidence available at the time of trial but trial counsel was also aware of the evidence and investigated the possibility of presenting the alibi defense. Indeed, prior to trial, Petitioner allegedly pled with counsel and the trial court to help him secure the phone records so as to establish that it would have been physically impossible for him to have committed the murder.  (APP 1245-46.)  However, trial counsel did not attempt to obtain the phone records because he felt as though the evidence would not support an alibi defense.

(APP 942.)  As such, this is not a case where the evidence is regarded as "new" in that it was not available at trial nor discovered because of trial counsel's ineffectiveness.  Consequently, this evidence does not satisfy the "new evidence" standard as it is defined by the Third Circuit and Petitioner cannot demonstrate actual innocence to excuse the procedural default of this ineffective assistance of counsel claim.

Even assuming that this evidence was new, Petitioner fails to show that it is more likely than not that no reasonable fact finder would have convicted him in light of the new evidence. Moreover, although Petitioner asserts that Michelle Saula would have testified that an individual called the agency regarding bond for Petitioner's brother in the early morning hours of December 17, 1997, the call was made to an answering service, not to Saula herself.  Rather, she received the message from the answering service with a phone number, which was subsequently traced to a pay phone.  However, she could not testify as to who made the call or the exact time the call was placed.  (APP 943.)  Notably, even if phone records had revealed that a phone call was placed to the bail bond agency during the precise time of the murder, it remains pure speculation as to who placed the call.  Consequently, the Court is not swayed that no reasonable juror would have found Petitioner guilty, and because Petitioner has failed to meet an exception to excuse his procedural default this claim is barred from federal habeas review.

### D.  Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  As provided for in 28 U.S.C. § 2253, "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   "A

petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner has not made the requisite showing in these circumstances. Accordingly, a certificate of appealability will be denied.

      Dated:  September 19, 2012

                                                         Lisa Pupo Lenihan
                                                         Chief United States Magistrate Judge

Cc:    Counsel of record.